EUGENIA STOTLER, Minor, by JOHN W. STOT-
LER, Guardian and Curator, v. CHICAGO & AL-
TON RAILWAY COMPANY, H. R. WISEMAN
and WILLIAM HAINES, Appellants.

**In Banc, December 18, 1906.**

1. **FEDERAL JURISDICTION: Diverse Citizenship: Negligence:
   Joinder of Railroad and Employees: Non-Feasance.** In a suit
   against a railroad company and its conductor and engineer,
   charging an injury to a traveler to be due to the negligent
   running of a train, the acts of the employees are not to be con-
   sidered mere non-feasance for which they are liable alone to
   the company, but the cause of action is an entirety and not
   separable.

2. ———: ———: ———: ———: **Fraud.** Nor is the plea, set
   up in a plea in abatement and in the answer, that the con-
   ductor and engineer were fraudulently joined as codefendants
   of the non-resident railroad company, established by a showing
   that no inquiry was made by plaintiff into the solvency of those
   resident employees. The jurisdiction of the State court is
   not destroyed by the plea of fraudulent joinder, and in this
   case it was held that no fraud was shown.

3. **NEGLIGENCE: Speed Ordinance: Acceptance.** A reasonable
   speed regulation of railroad trains through a city comes within
   the police powers of a municipality; and its violation, where
   damages follow as a sequence, is actionable negligence, whether
   the railroad company has accepted the provisions of the or-
   dinance or not.

   ———: ———: **Evidence: Erroneous Admission: Motion to
   Strike Out.** The time to object to evidence as to the speed
   of the trains outside of the town and outside the territory cover-
   ed by the pleadings and ordinance, is at the time such evi-
   dence is offered; and an objection that such testimony is too
   vague and indefinite is not equivalent to an objection that the
   testimony relates to a speed not in issue.

5. ———: ———: ———: ———: ———: **Speed Outside of Town.**
   And if afterwards when the court's attention is sharply drawn
   to the fact that such testimony is outside the issues the court
   rules it out, the overruling of a motion then made to strike
   out all such testimony previously admitted, though it might
   properly have been sustained, will not be held to be reversible

error, if the instructions clearly confine the question of speed to the issues made by the pleadings, and much of the testimony on the speed outside the town covered the speed also inside the town and there is much testimony on its speed within the corporate limits—the irrelevant testimony, under the circumstances, not being sufficiently prejudicial to constitute reversible error.

6. ———: **Evidence: Speed of Train: Non-Expert.** A non-expert witness may be qualified to testify as to the speed of a train. He must qualify to make his opinion of probative force, but his qualification depends on his experience and training, his location, the observations he has made of the running of trains, and other things which make his opinion of value—its weight being for the jury. The opinion as to the speed of the train in question, of persons who had through a series of years made observations upon the speed of trains by watching their passage, was admissible.

7. ———: **Unlawful Speed: Crossing Track: Causal Connection.** Where the ordinance made a speed in excess of eight miles an hour unlawful, and the evidence shows that the train was running at a speed of at least twenty miles, and that the engine struck the hind wheel of the rapidly moving buggy in which plaintiff was trying to cross, it cannot be said that there was no causal connection between the negligence proved and the injury; on the contrary, it clearly shows that had the ordinance been obeyed plaintiff would have gotten over in safety. Hence, it was not error to instruct the jury that running the train in excess of eight miles per hour was negligence, "and if you believe that as a direct consequence the plaintiff was injured you will return a verdict for her, unless." etc.

8. ———: **Signal: Prima-facie Case.** Plaintiff in a suit for personal injuries based on the negligence of those in charge of defendant's railroad train to ring the bell or sound the whistle makes out a prima-facie case when he proves the violation of the statute and the injury.

9. ———: ———: **Proof: Negative Evidence.** A negative fact may be proved by negative evidence. Defendant's failure to give the signals required by statute of a train approaching a crossing may be established by those in a position to hear who did not hear. That testimony is not overthrown by the positive testimony of the engineer, fireman and other employees of defendant that the signals were timely given, for the issue still is one of fact for the jury.

10. ———: ———: **Eliminating Issue from Case: City.** Where failure to give the whistle required by statute is one of the alleged acts of negligence, it is not proper to eliminate whistling

Stotler v. Railroad.

from the instructions if the whistling post was entirely outside the corporate limits of the city, although all but seventy-two feet of the track between the whistling post and the crossing was inside the city limits.

11. ———: ———: City: Definition. Although the statute does not require the train to give signals of its approach within cities, and although the city of the fourth class in which plaintiff was injured was a small town having something like one thousand inhabitants, it is not reversible error to give an instruction which simply uses the words "except cities," without further enlightening the jury on the legal meaning of the word city. It cannot be said that the jury were confused into the belief that by the words "except cities" the statute required signals to be given in all smaller towns.

12. ———: Medical Attendance: Nurses: Instruction. The instruction on damages to be awarded contained the words, "and in addition you may also allow such fair and reasonable sums as you believe she was compelled to expend for medical treatment and nursing." *Held*, that the instruction, narrowly construed, does not say that the jury should return a verdict for medical treatment and nursing merely contracted for and not paid. But assuming that it does mean that, it was not error.

13. ———: ———: ———: ———: By Guardian. An instruction allowing the infant plaintiff to recover for nurse's and physician's services paid or contracted for, is not erroneous on the theory that her guardian and curator is alone liable therefor, and could alone contract therefor, even though she was unconscious from the time the accident occurred and remained so when the services were contracted for. Either he or she may sue to recoup the corpus of her estate diminished by outlays caused by the wrongful acts of defendant.

14. ———: Earning Capacity: Infant: No Evidence: Instruction. The instruction may tell the jury to consider to what extent the infant plaintiff's capacity for earning a living in the future has been impaired by the injury, even though there was no evidence that she had previously performed labor or was in such financial condition as to be forced to labor in future. As to infants of tender years it is impossible to obtain specific evidence of the pecuniary value of such loss, and therefore the rule of law is that the question of damages for loss of future earning capacity, in the case of an infant, in the absence of express evidence, is left to the sound judgment, experience and conscience of the jury.

15. ———: Contributory: No Evidence: Presumption in Favor of Plaintiff. Contributory negligence being an affirmative defense,

Stotler v. Railroad.

a plaintiff left by her injuries unconscious and having no knowledge of the accident, is entitled to certain presumptions in her favor, among which are (1) that, in the absence of evidence to the contrary, she did exercise due care in approaching the track, and (2) that, being bound by law to look and listen, she saw what she would have seen had she looked, and heard what she would have heard had she listened. .

16. ——: ——: ——: ——: Imputed Negligence. A plaintiff, nearly sixteen years old, riding in a buggy driven by her mother, in the absence of evidence that she neither looked nor listened for the approaching train, is not chargeable with contributory negligence in not looking or listening, but only for actual participation in the negligent act of her mother in driving from a place of safety on to the track immediately in front .of an approaching train; if she did not participate in that negligent act (assuming it to be negligent), she is not responsible therefor, and there is no independent cause intervening between the company's negligence in running the train at an unlawful speed and her injury.

17. ——: ——: ——: ——: ——: Extending Arms. It cannot be assumed, under the circumstances, that plaintiff, by extending her arms, as the train was about to strike the buggy, was urging the horse forward, nor can it be assumed, even if her purpose was to check the horse, that that act, in the extremely dangerous situation, was due care, or lack of due care. That act cannot be held to be such participation in the negligent act of her mother in driving upon the track, as bars her recovery.

18. **EXCESSIVE VERDICT: $15,000.** A verdict of $15,000 awarded to a girl nearly sixteen years old, for broken bones, scars, wounds and inward hurts and other permanent injuries, was not excessive.

19. **JUDGMENT: Reversal as to Some Tortfeasors.** A judgment for personal injuries against a railroad company and its conductor and engineer may be reversed as to the conductor, on the ground that there was no evidence of any probative force tending to show that he was guilty of the negligence which caused the injury, and affirmed as to the company and engineer.

Appeal from Callaway Circuit Court.—*Hon. Alex. H. Waller*, Judge.

AFFIRMED AS TO DEFENDANTS RAILWAY COMPANY AND HAINES; REVERSED AS TO DEFENDANT WISEMAN.

*Scarritt, Griffith & Jones* for appellants.

(1)   As no delinquency of the company itself is charged to have concurred with the delinquencies of its agents, there was no joint liability, and this cause was removable by the railway company.   Shafer v. Brick Co., 128 Fed. 97; Helms v. Railroad, 120 Fed. 389; Hukill v. Railroad, 72 Fed. 754; Kelly v. Railroad, 122 Fed. 286; Henry v. Railroad, 132 Fed. 715; Steinhauser v. Spraul, 127 Mo. 541.   (2)   The court erred to the great prejudice of defendants in permitting a number of witnesses to testify, over the objection of the defendants, as to the rate of speed at which the train in question was running prior to the collision.   Petty v. Railroad, 179 Mo. 666; Campbell v. Railroad, 175 Mo. 161; Helm v. Railroad, 185 Mo. 122.   (3)   Plaintiff's instruction on the measure of damages is fatally defective.   There was no evidence whatever before the jury as a basis upon which they could have computed or determined plaintiff's earning capacity.   The jury were left to guess, or to follow a mere whim in this regard.   Dunn v. Railroad, 21 Mo. App. 205; Matthews v. Railroad, 26 Mo. App. 86; O'Brien v. Loomis, 43 Mo. App. 40.   (4)   The demurrers to plaintiff's evidence and the peremptory instructions on behalf of all the defendants at the end of all the evidence should have been given by the trial court, because it clearly appears from the evidence that plaintiff was herself guilty of negligence which contributed to cause her injuries. A person approaching a railroad crossing may not escape the consequences of his or her failure to look and listen because another may have hold of the lines, when the one not driving has as good or better opportunity than the driver to see or hear an approaching train.   Aurelius v. Railroad, 19 Ind. App. 584; Miller v. Railroad, 128 Ind. 97; Brickell v. Railroad, 120 N. Y. 290; Bush v. Railroad, 62 Kan. 709; Railroad v. McLeod, 78 Miss. 334.

*P. H. Cullen, W. H. Logan* and *Walter Burch* for respondent.

(1)   A non-resident railroad company, sued with its resident servant, for injuries caused by the latter's negligence, cannot remove the suit to a Federal court. Railroad v. Dixon, 179 U. S. 131; Powers v. Railroad, 169 U. S. 92; Winston v. Railroad, 55 L. R. A. 603; Charman v. Railroad, 105 Fed. 449; Railroad v. Carson, 194 U. S. 136; Railroad v. Marten, 178 U. S. 245; Railroad v. Wangelin, 132 U. S. 559; Dougherty v. Railroad, 122 Fed. 205; Roberts v. Steel Tube Co., 131 Fed. 729; Miller v. Clifford, 133 Fed. 821.   (2)   The servant is personally liable to third persons for injuries suffered by them on account of his failure to exercise care while actively engaged in the performance of his duties as a servant.   Harriman v. Stowe, 57 Mo. 93; Lattman v. Barnett, 62 Mo. 159; Buis v. Cook, 60 Mo. 393; Peckham v. Lindell Glass Co., 9 Mo. App. 463; Martin v. Benoist, 20 Mo. App. 270; Steinhauser v. Spraul, 114 Mo. 551, 127 Mo. 541; O'Neil v. Young, 58 Mo. App. 634.   On the question of joinder of master and servant, and the rulings as to separable controversy, we ask the court to consider the following additional authorities: Railroad v. Carson, 194 U. S. 136; Davenport v. Railroad, 135 Fed. 960; Schunpert v. Railroad, 95 Am. St. Rep. 802; Johnson v. Magnuson, 68 Ill. App. 448; Railroad v. Sittasen, 74 N. E. 898; Railroad v. Harris, 38 So. 225; Howe v. Railroad, 60 L. R. A. 949; Hoosier Stone Co. v. McLain, 133 Ind. 231; Gardner v. Railroad, 65 S. C. 341; Yates v. Latta, 117 N. C. 189; Hawkesworth v. Thompson, 98 Mass. 77; Morlin, Adm's, v. Railroad, 95 Ky. 612; Lowlor v. French, 35 N. Y. Supp. 1077; Fort v. Whipple, 11 Hun 593.   (3)   Misfeasance is the improper doing of an act which a person might lawfully do, and negligently running a train is misfeasance.   Bell v. Jasselyn, 3 Gray (Mass.) 309; Osborne v. Morgan, 130 Mass. 102; Mec-

hem on Agency, secs. 571-572; People v. Auburn, 85 Hun 608; 20 Am. and Eng. Ency. Law (2 Ed.), 802; Ellis v. McNaughton, 76 Mich. 242. The petition in this case clearly charges the agent with misfeasance, not with non-feasance. Warax v. Railroad, 72 Fed. 637. (4) The code of Missouri, like the codes of Indiana and New York, abolish forms of action, and master and servant may be joined in one action. The Missouri statute, declaring who may be joined as defendants, is very broad. R. S. 1899, secs. 542, 545, 2810; Phelps v. Wait, 30 N. Y. 78; Griffith v. Ess, 126 Mo. 50; 2 Thomp., Neg. (1 Ed.), sec. 11. (5) The prevailing doctrine is that the master and servant may be jointly sued for an injury resulting from the servant's negligence. Cooley on Torts (2 Ed.), p. 164; R. S. 1899, sec. 2870; Comtez v. Parkenson, 50 Fed. 170; Connell v. Railroad, 13 Fed. 241; Wright v. Compton, 53 Ind. 337; City of Peoria v. Simpson, 110 Ill. 294; Johnson v. Magruson, 68 Ill. App. 448; Hoye v. Raymond, 25 Can. 665; Phelps v. Wait, 30 N. Y. 78; Hewett v. Swift, 3 Allen 420; Wright v. Wilcox, 19 Wend. 343; Montfort v. Hughes, 3 E. D. Smith 591; Suydam v. Moore, 6 Barb. 358; Wilkins v. Ferrell, 10 Tex. Civ. App. 231; Schaefer v. Osterbrink, 67 Wis. 495; Greenberg v. Lumber Co., 90 Wis. 225; Schearer v. Evans, 89 Ind. 400; Michael v. Alestree, 2 Lev. 172, 1 Vent. 295; Steel v. Dester, 3 C. P. Div. 121; Moreton v. Harden, 4 Barn. & C. 223; Newman v. Fowler, 37 N. J. L. 39. (6) Witnesses who are not experts are competent to give their opinions as to whether a body was moving slow or fast, and are permitted to give their opinions and conclusions as to the speed of trains. Walsh v. Railroad, 102 Mo. 582; Covell v. Railroad, 82 Mo. App. 180; Haworth v. Railroad, 94 Mo. App. 224; Ashton v. Railroad, 105 Mo. App. 231; Railroad v. Steinberg, 17 Mich. 99; Salter v. Railroad, 59 N. Y. 634; Vanhorn v. Burlington, 59 Iowa 33; Railroad v. Hilderbrand, 52 Kan. 284:

200 Sup.—8

Railroad v. Ashline, 171 Ill. 318; Robinson v. Railroad, 112 Fed. 487.; Nesbit v. Crosby, 74 Conn. 554; Railroad v. Hunter, 6 App. Cas. (D. C.) 287; Railroad v. Larson (Neb.), 97 N. W. 824; Chipman v. Railroad, 12 Utah 68; Railroad v. Stewart, 128 Ala. 313. (7) In the absence of other evidence the unlawful rate of speed will be presumed to be the cause of the accident. Schlereth v. Railroad, 96 Mo. 515; Keim v. Railroad, 90 Mo. 321; Graney v. Railroad, 140 Mo. 89; Jobin v. Railroad, 18 S. W. 996; Prewett v. Railroad, 134 Mo. 615; State v. Railroad, 15 Atl. 38. (8) Testimony of witnesses in a position to hear a bell or whistle and who swear they did not hear it, is evidence that the bell was not rung and that the whistle was not sounded. State ex rel. v. Railroad, 79 Mo. App. 634; Murray v. Railroad, 176 Mo. 183; Milligan v. Railroad, 79 Mo. App. 399; Elliott v. Railroad, 105 Mo. App. 523; Fry v. Railroad, 111 Mo. App. 335. (9) No such judicial legislation has been attempted as to lay down the hard and fast rule that the traveler approaching a railway crossing is bound under all circumstances to stop as well as to look and listen for approaching trains; but the courts generally agree that whether he ought to stop, in the exercise of ordinary care and caution, is a question for a jury, depending upon the circumstances in each particular case. Elliott v. Railroad, 105 Mo. App. 523; Frank v. Railroad, 99 Mo. App. 323; Huckshold v. Railroad, 90 Mo. 548; Donohue v. Railroad, 91 Mo. 357; Mayes v. Railroad, 71 Mo. App. 142; Petty v. Railroad, 88 Mo. 318; Johnson v. Railroad, 77 Mo. 546; Russell v. Receivers, 70 Mo. App. 88; Baker v. Railroad, 122 Mo. 544; Kelly v. Railroad, 88 Mo. 534; O'Connor v. Railroad, 94 Mo. 150. Neither the plaintiff nor her mother is guilty of contributory negligence as a matter of law because when they attempted to drive over the crossing the train was so far away they could have crossed in perfect safety had it

been run at a lawful rate of speed as required by ordinance.  Hutchinson v. Railroad, 161 Mo. 254; Kellny v. Railroad, 101 Mo. 77; Sullivan v. Railroad, 117 Mo. 221; Eswin v. Railroad, 96 Mo. 290; Gratiot v. Railroad, 116 Mo. 464; Murray v. Railroad, 108 Mo. App. 502; Deitring v. Railroad, 109 Mo. App. 525; Langhoff v. Railroad, 19 Wis. 515.  (10)  The doctrine of imputable negligence does not obtain in this State, hence the negligence, if any, of the mother cannot be imputed to the child.  Sluder v. Railroad, 189 Mo. 107; Profit v. Railroad, 91 Mo. App. 369; Marsh v. Railroad, 104 Mo. App. 577; Baxter v. Railroad, 103 Mo. App. 597; Becke v. Railroad, 102 Mo. 544; Munger v. Sedalia, 66 Mo. App. 629; Orourke v. Railroad, 147 Mo. 352; Bailey v. Railroad, 152 Mo. 462; Johnson v. St. Joseph, 96 Mo. App. 671; Keitel v. Railroad, 28 Mo. App. 657; Duvall v. Railroad, 65 L. R. A. 722.  In this State the rule is firmly established that the negligence of the parent is not imputable to the child.  Boland v. Railroad, 36 Mo. 484; Winters v. Railroad, 99 Mo. 509; Brill v. Eddy, 115 Mo. 596.  (11)  While the occupant of a vehicle, controlled by another, is not absolved from all care at railway crossings, the law does not impose upon the occupant the same degree of care imposed on the driver.  The situation of the occupant is different from the situation of the driver.  One is active, the other passive.  The occupant has a right to presume that neither the company nor the driver will be negligent, and it is only when the contrary appears that the law imposes upon the occupant active diligence.  Howe v. Railroad, 30 L. R. A. 684; Marsh v. Railroad, 104 Mo. App. 587; Railroad v. Eadie, 43 Ohio 91; Gibson v. Railroad, 83 S. W. 854; Railroad v. Gibson, 91 Tex. 52; Dyer v. Railroad, 71 N. Y. 228; Crawford v. Railroad, 22 Jones & S. 262; Hoag v. Railroad, 18 N. Y. 648; State v. Railroad, 15 Atl. 39; Lapsley v. Railroad, 50 Fed. 172; Baltimore v. Railroad, 29 Atl. 518; Railroad

v. Steinbrenner (N. J. L.), 54 Am. Rep. 127; O'Toole
v. Railroad, 158 Pa. 99.

LAMM, J.—Suit for personal injuries at a road
crossing. The defendant railway company is incorpo-
rated under the laws of Illinois and operates a railroad
running from Louisiana, Missouri, through the city of
Laddonia in Audrain county, to Kansas City. Defend-
ants Wiseman and Haines are residents of Missouri
and servants of their corporate co-defendant, acting re-
spectively as conductor and engineer on the train doing
the injury.

The crossing in question is that of Pine street, a
street of the city of Laddonia, a public highway running
north and south, and said railroad (running at a tan-
gent, southwest and northeast at that point) within said
city of Laddonia.

Eugenia Stotler is a young girl, aged fifteen years
and some months on the 22nd day of April, 1903. Her
father was dead and she, with her mother, Phoebe, and
her brothers, resided on a farm a mile or so from said
town, a city of the fourth class, of, say, 1,000 people.
Eugenia sued through her guardian and curator, her
brother, and at the trial it was admitted he was her
guardian and curator, but when he was appointed and
qualified does not appear.

On the evening of said day in April, while still day-
light, to-wit, about 6:40 p. m., she was riding with her
mother in a one-horse top-buggy (with the top down)
going north on Pine street. At said crossing, when an-
other instant would have put them over and out of dan-
ger, the hind wheel of their buggy was struck by a lo-
comotive pulling a caboose and running east from
Slater, Missouri, to Roodhouse in Illinois, to transport
soldiers from that point.

It was running on no schedule, i. e., was an extra
"running wild." The engineer testified he was to get
to Roodhouse as quickly as possible. "He was," said

he, "going to get there as soon as he could with safety." The collision tore the mother to pieces, and the daughter received hurts for which she recovered a verdict for $15,000 against all the defendants.

From a judgment entered on that verdict, they appeal. The petition counts on the negligent violation of an ordinance of the city of Laddonia making it unlawful to run any locomotive, car or train of cars upon any railroad track, tracks or switches within the corporate limits of said city, where said track, tracks or switches are unfenced, at a rate of speed to exceed eight miles per hour. It further counts upon defendants' failure to ring a bell or blow a whistle as provided by statute; and seeks to recover on the theory that defendants saw and knew, or by the exercise of due diligence might have seen and known, that plaintiff was in a perilous position, unaware thereof and unable to escape from impending danger, and thereafter failed to give the usual and ordinary signals in time to avert the injury, and negligently failed to stop or slacken the speed of said train in time to avert said injury, when they might by the exercise of due care (after seeing and knowing her peril) have stopped the train or slackened the speed thereof in time to avert said injury.

As we see it, the case was not put to the jury on the ground of negligence last above, hence, there is no life left in that issue.

Other facts material to an understanding of the case will be uncovered in connection with a consideration of the assignments of error.

I. Before answering, the railway company in due time and form filed its petition and bond in the circuit court of Audrain county to remove the cause to the United States circuit court for the Eastern District of Missouri, on the ground of diverse citizenship between the company and Eugenia Stotler and her guardian. It was alleged therein that Wiseman and Haines,

citizens of Missouri, were fraudulently and improperly joined as parties defendant for the sole purpose of defeating the right of petitioner to such removal, and that plaintiff's petition stated no cause of action against Wiseman and Haines, in that the acts complained of, as to them, were acts of mere non-feasance for which they were answerable alone to the company —in short, that the averments of plaintiff's petition showed the controversy to be a separate and separable one with no joint liability charged. The petition for removal was disallowed.

Thereupon defendant corporation filed a plea, termed by it a plea in abatement, in which the jurisdiction of the State court was assailed by the same matter. On issue made, on a hearing before the court, defendants placed upon the stand Mr. Cullen, attorney for plaintiff, and he was asked whether his object in joining defendants Wiseman and Haines was not to prevent the removal of the cause to the United States court. He answered that his object was to sue the parties who were liable for the wrong—to hold all the parties who were in the wrong liable for it, whether it was the act of the railway company or its servants. He was then asked if he made any inquiries as to whether he could recover anything from defendants Wiseman and Haines, i. e., whether they were solvent? He replied that he made no inquiry, that they were the active agents in committing the wrong and were liable for the wrong in his judgment. The question was then asked Mr. Cullen whether he would have joined them in this action but for the fact that by that means he expected to defeat the removal of the cause to the United States court? To this inquiry he answered as follows: "I cannot say what I would do in that case. I will cross that bridge when I come to it in the management of the case." This was all the

evidence on the plea in abatement. It was overruled —defendants excepting.

Thereupon the railway company filed answer and therein again renewed its assault on the jurisdiction of the State court, by way of defense—setting forth its various unsuccessful steps taken to bring about such removal, and the adverse rulings of the court thereon.

The cause went to Callaway county on the application of Haines and Wiseman. A demurrer to the evidence having been offered on behalf of the railway company and overruled, and the motion for a new trial again directing the court's attention to alleged error in its ruling on the question of jurisdiction, the matter is assigned for error here.

It would seem the law on this Federal question, once much vexed and long in a plastic state, has been somewhat put in a condition of stable equilibrium and rest by the Supreme Court of the United States. [Railroad v. Dixon, 179 U. S. 131; Railroad v. Thompson, 200 U. S. 206; Railroad v. Bohon, 200 U. S. 221.] In a very late case, Lanning v. Railroad, 196 Mo. 647, those decisions were considered In Banc, and we all then agreed that further discussion of this question was foreclosed by them—they being utterances of the supreme oracle of the law on Federal questions. In the Lanning case, as here, the question of a fraudulent joinder was raised by the petition for removal, and it was not held fatal to the jurisdiction of the State court. But it is plain there is no evidence of any fraud introduced on the hearing of the plea in abatement. At the trial on the merits no evidence was directed to the question of fraud, and, as the pleadings stand, under the evidence on said plea, the question of fraud places defendants in a strait betwixt two. That question becomes an edged tool, dangerous to meddle with; because on this record it is as easy to say that defendants injected the question of fraud into the peti-

tion of removal for the purpose of defeating the juris-
diction of the State court as it is to say that plaintiff
joined Wiseman and Haines, residents of Missouri,
with the defendant corporation, a non-resident, for the
purpose of defeating the jurisdiction of the Federal
court. The cause of action sued for is an entirety and
not separable; the petition so shows; our decisions
so hold; and the Supreme Court of the United States
so holds, reserving only the right to protect the juris-
diction of the Federal court where an actual fraudulent
joinder of parties was made for the purpose of de-
feating its jurisdiction.

This assignment of error is, therefore, disallowed.

II. In making her case, plaintiff was allowed to
introduce section 65, chapter 9, of the Revised Ordi-
nances of the city of Laddonia, denouncing as a mis-
demeanor the running of any locomotive, car or train
of cars on any track or tracks within the city, where
said track or tracks may or shall be unfenced, at a
rate of speed exceeding eight miles per hour. To the
introduction of this ordinance, an objection was lodged
to the effect that, under the decisions of this court, it
must first appear the ordinance had been agreed to
by defendant corporation before a civil liability could
be predicated of its violation. The objection being
overruled, defendants excepted. At the close of the
case, the same matter was brought to the attention of
the court by an instruction (defendants' instruction
No. 2) in which the court was asked to say that the
ordinance was improperly admitted in evidence and
was withdrawn from the jury. This instruction was
refused and defendants excepted. In their formal as-
signment of error here, defendants complain of the re-
fusal of said instruction No. 2, among others.

If, however, in an elaborate brief, rich in learning
and bristling with points, this assignment of error is
pressed by learned counsel now representing defend-

ants, we have overlooked it—but, if in the case, there is no merit in it. Defendants' learned trial attorney was betrayed, it would seem, into an inadvertence when at the trial on December 18, 1903, he suggested that up to that time, under the decisions of this court, ordinances regulating the speed of railroads in cities of this State, were effective or not at the choice of railway companies, *i. e.*, had to be accepted to bind them.

In Jackson v. Railroad, 157 Mo. 621, decided in April, 1900, a line of cases was reviewed and the doctrine was announced as established (or re-established) that a reasonable speed regulation came within the police power of a municipality and its violation, where damages followed as a sequence, was actionable negligence. The doctrine of the Jackson case was under consideration in Sluder v. Railroad, 189 Mo. 107, decided In Banc, since the trial in the case at bar, and was held to include a vigilant watch ordinance. Before that, In Banc, in 1901, Hutchinson v. Railroad, 161 Mo. 246, the same conclusion as in the Jackson case was reasserted. It may be said, then, that it was a rule of law in this State at the time of the trial, that the violation of a reasonable ordinance regulation of speed was negligence *per se*. That doctrine, somewhat shaken at one time but never exploded, may now be taken as so buttressed by both reason and authority as to withstand any (but a legislative) assault.

III. It is at length and stoutly contended that improper and prejudicial testimony was admitted on behalf of plaintiff. The material assignment in this regard relates (a) to the admission of evidence on the rate of speed maintained by the train the whole way between Rush Hill (the next station west) and Laddonia, that is, that the rate of speed was not confined to the corporate limits of Laddonia, but to the going speed for, say, five miles outside of that town. (b) It is

further insisted that witnesses not qualified to speak were allowed to give their opinion of the train's speed.

1. The first contention, we think, is somewhat based on a misapprehension. It is true the record shows that witnesses spoke of the rate of speed maintained from Rush Hill to Laddonia, but the objection lodged at the time to such evidence was, not that the testimony related to a place where the speed was not in issue, but, in effect, that the testimony was "too vague and indefinite" and that the witness was incompetent to give a speed opinion. The record shows that finally, when the court's attention was sharply drawn to the fact that under the pleadings the issue was the speed maintained within the corporate limits of Laddonia and not outside, the court ruled in favor of defendants and limited the evidence to the territory covered by the ordinance and pleadings.

In this connection when the court so ruled, a motion was made to exclude the former testimony, and the motion was overruled. The motion, in our opinion, might have been sustained without committing error, but we do not think it error to overrule it, and this is so because some of the testimony struck at covered the speed, not only outside the corporate limits, but up to and inside the town, until the view was obstructed. Not only so, but the admission of this testimony, on the facts of this case, could have had no effect on the jury under instructions confining their consideration to the speed within the city and to the allegations of the petition.

And in this connection it may be said that the time to make an objection of the precise character here presented was at the time the evidence was being introduced. There is a time and season for all things. If not then made, the ruling of the trial court on a subsequent motion to exclude should be so prejudicial as to be judicially seen and felt in order to constitute re-

versible error. Now, in this case, there was a cloud of witnesses whose testimony was confined to the train's speed in the town. This being so, it ought not to be held that a bit of irrelevant testimony tending to show a prior rate of speed may be likened to a lump of leaven and, hence, comes within the dogma (respectably vouched for) "that a little leaven leaveneth the whole lump."

In the light of the foregoing circumstances and observations, in our opinion, there was no vice in the ruling below.

2. The same disposition must be made of defendants' insistence that witnesses, not qualified to speak, were allowed to give their opinion of the speed. The general rule, deduced from the cases, as laid down in a standard work (Lawson on Expert and Opinion Evidence [2 Ed.], p. 505), is as follows: "The opinions of ordinary witnesses derived from observation are admissible in evidence when, from the nature of the subject under investigation, no better evidence can be obtained, or the facts cannot otherwise be presented to the tribunal, e. g., questions relating to time, quantity, number, dimensions, height, *speed,* distance, or the like." And the author cites, as sustaining the text on speed, many cases. [See note 5 on p. 507.]

One of the leading cases on this subject was decided in Michigan (Railroad v. Van Steinburg, 17 Mich. 99). In that case Judge COOLEY, speaking to the point, said:

"The point to which the attention of the witness was directed was the speed of a passing object. The motion of the train was to be compared to the motion of any other moving thing, with a view to obtaining the judgment of the witness as to its velocity. No question of science was involved, beyond what would have been, had the passing object been a man or a horse. It was not, therefore, a question for ex-

perts.  Any intelligent man who had been accustomed
to observe moving objects, would be able to express an
opinion of some value upon it, the first time he ever
saw a train in motion.  The opinion might not be so
accurate and reliable as that of one who had been ac-
customed to observe, with timepiece in hand, the mo-
tion of an object of such size and momentum; but this
would only go to the weight of the testimony, and not
to its admissibility.  Any man possessing a knowledge
of time and of distances would be competent to ex-
press an opinion upon the subject.''

It may be that the profound jurist, just quoted, stat-
ed the doctrine a trifle broadly for use in the practical
administration of justice, and that this court might
not go quite so far as to hold that a man who had never
seen a train in motion could express an opinion of any
sensible value on the rate of such motion the first time
he clapped eyes upon one.  The Van Steinburg case
was substantially followed in Guggenheim v. Railroad,
66 Mich. 150, and in Thomas v. Railroad, 86 Mich. 496.

Obviously, it would be nonsense to say that a rate
of speed could only be shown by expert testimony.  If
that were so, then a plaintiff injured by negligent
speed, who was so unfortunate as to have no premoni-
tion of his coming fate and who, therefore, had omitted
to provide himself with experts at hand and so located
as to see the train and judge of its speed at the critical
time, would be in hard lines, indeed.  The story of
such a case would run thus: no experts, no case—pos-
sibly finding its counterpart in brevity in the history
of snakes in Ireland, or in the story of the three wise
men of Gotham who went to sea in a bowl.

Defendants' learned counsel concede that the fore-
going general rule is the rule in Missouri (Walsh v.
Railroad, 102 Mo. 1. c. 586; Aston v. Railroad, 105 Mo.
App. 1. c. 231, and cases cited); but they contend, and
with show of reason, too, that a non-expert witness

should possess some pertinent qualifications in order that his opinion should be admitted upon the speed of a train, and they cite us to Petty v. Railroad, 179 Mo. 666; Campbell v. Railroad, 175 Mo. 161; Helm v. Railroad, 185 Mo. 212; Muth v. Railroad, 87 Mo. App. 434; Mathieson v. Railroad (Neb.), 92 N. W. 639; Mott v. Railroad, 120 Mich. 127; Railroad v. Huntley, 38 Mich. 540.

The question is, in what do those qualifications consist? We have examined the cases cited and find the Mathieson case, *supra,* was reconsidered and the reasoning of the court in the first opinion on the point under consideration was not readopted. [97 N. W. 243.] It appears from the last opinion that the witness formed no judgment of the speed at the time, and made no observations enabling him to do so. At the trial he was asked whether he could now tell the rate of its motion. The evidence was excluded and the Supreme Court of Nebraska said it was properly excluded; because, at the time of the trial, he could have had no opinion on the matter except such as was drawn by inference or calculated from the knowledge of the relative positions of the two vehicles and the speed at which his own was moving. The court said that, in such condition of things, it was for the jury and not for the witness to draw a conclusion.

In the Huntley case, *supra,* the doctrine of the Van Steinburg case was somewhat limited and it is held, in effect, that the speed of a train cannot be shown by the opinions of passengers observing only from the inside, unless their experience and observation is such as to make their judgment reliable. This was construed to be the only effect of that opinion by Lawson (Lawson on Expert and Opinion Evidence [2 Ed.], p. 508); and by Rogers (Rogers on Expert Testimony [2 Ed.], p. 245.)

The Mott case, *supra,* also a Michigan case, was

somewhat controlled by facts peculiar to itself, but GRANT, J., in passing on certain opinion evidence on speed, said it should have been excluded because neither the experience of the witness nor his observation was sufficient to enable him to form an opinion.

Coming to our own court, in the Petty case, *supra,* a witness testified that a car ran at the rate of twenty-five miles an hour. The question in the case was common law negligence. He could not say it was running faster or slower than cars usually ran at that point. As we gather from the opinion no attempt whatever was made to qualify him and his testimony is disposed of by MARSHALL, J., as follows: "As he did not show himself qualified by training or experience to speak to that question, his testimony need not be further considered."

In the Campbell case, *supra,* a witness was allowed to testify over the objection of defendant that a car ran at twelve to fifteen miles an hour. The witness did not see the car. He was standing on his front porch about 125 feet from the accident, with a house intervening, and was permitted to give his opinion on the speed of the car, judged of alone from its *noise.* This court, through VALLIANT, J., reasoned out the conclusion that the evidence should have been excluded. But, in coming to this conclusion, care was taken not to say that the eye alone could convey an impression of speed to the mind; for it was not argued that a witness in a given instance might not be shown to have such unusual technical knowledge from experience and study as would entitle him to a speed opinion based only on the sound of a moving car. All that was said was that the witness under discussion was not shown to possess such qualifications.

The Helm case, *supra,* passed off on an issue not involving the speed of the train (p. 223), but from suggestions made by MARSHALL, J., in deciding it, it

may be inferred that, had the speed of the train been a material issue, the testimony on that point from two witnesses would have been held without probative force. One of these witnesses did not attempt to qualify himself and had no experience with trains except to ride on them. The other witness, in the language of the opinion, was ".a common laborer" and merely undertook to qualify himself by saying he had been on the road, off and on, for twelve or fifteen years. The phrase used, to-wit, "a common laborer," was merely *descriptio personae*. It could not have been intended to mean that a common laborer, *qua* "common laborer," was not qualified to speak of the rate of speed of a going railroad train, since a common laborer (as such) on the witness stand in a non-expert matter is under no ban known to the law. It must be noted also in that case there were uncontradicted physical facts which, in the opinion of the writer, showed the evidence of those two witnesses to be without any deciding weight. But, as said, the case rode off on another theory.

In the Muth case, *supra,* witnesses were allowed to give their opinion, who, not only had had no experience in operating cars, but had traveled very little on them and had paid no attention to the speed at which they ordinarily ran. In this state of the record, BLAND, P. J., for the St. Louis Court of Appeals, said: "While, as to ordinary matters that come under common observation, a non-expert witness may give his opinion, yet, the witness should be able to show that he has some knowledge, some familiarity with the subject about which he is called on to give an opinion, before he is permitted to testify to that opinion."

In other cases stress has been laid upon the obvious fact that a witness, located in a right line with a coming or going train, is illy prepared to judge of its speed; and the sum of the matter may be said to

be that the non-expert witness must qualify, but his qualifications may be referred to his observation, as well as to his experience and training, and that any intelligent person who has made observations of the running of trains, or who, for instance, had compared the speed at which trains ran, or whose experience or training was such as would reasonably entitle his opinion to some value, and who, in the instance in hand, had fair opportunity to observe the motion of the train or to judge of the time it covered a known distance, was entitled to give an opinion on its speed — the weight of it being for the jury.

No inflexible general rule can be laid down avoiding dangers said to lurk in general definitions, and much must be left to the good sense of the judge, *nisi*. Now, in the case at bar, the learned trial judge, using circumspection, excluded some of the evidence offered on the speed issue because the witnesses, to his mind, were not qualified to give an opinion of any value. But he permitted a mass of testimony to be introduced from persons who had observed the speed of this train and who had made observations through a series of years upon the speed of trains by watching their passage. All of this testimony was objected to, but in our opinion it came within recognized rules governing admissibility of this character of proof.

The assignment of error in hand is, therefore, disallowed.

IV. It is next contended there was error in giving plaintiff's instructions. The scope of this assignment is such that a consideration thereof demands a fuller statement of the facts, gleaned from a voluminous record.

On the part of the plaintiff, the case went to the jury on testimony tending to show by some of her witnesses that the train was running at eighty or seventy-five miles an hour inside of the corporate limits. The

estimate placed on its speed at the crossing by other of her witnesses ran as low as forty-five or thirty miles an hour. On the other hand, defendants' case proceeds on the theory (and substantially the concession) that no controlling heed was paid to the speed ordinance of Laddonia by the engineer; and their testimony tended to show that the engine did not have the capacity to run at a rate of sixty or seventy-five miles an hour; and that the train entered Laddonia at about twenty-eight miles an hour but slowed down to, say, twenty-two miles an hour as it approached and passed the Pine street crossing. On this score, we are impressed with the fact that a very high speed was maintained up to the very moment of the collision. And this is so, not only because plaintiff's witnesses estimate its speed as above, but the record abounds with corroborative proof; for instance, its unusually high speed was the subject of observation and comment by citizens before they heard of the accident — several of defendants' witnesses making its speed very fast, and one of them expressing his view in the chimney-corner hyperbole that "it ran like a streak of lightning." Its speed was further indicated by the fact that it ran beyond the crossing nearly 1,000 feet before it stopped. So much for the evidence on the speed issue.

On the issue of giving train signals, the state of the record is this: On one side was testimony tending to show that no signals were given until very close to the crossing; *contra,* there was strong evidence the statutory signals were given at the right time and place both by whistle and by bell, and, in fact, some of defendants' testimony tended to prove there were more signals given than required by statute.

The crossing is 1,248 feet east of the west line of the town, and south of the railroad track is an east-and-west street called First street. Driving west on First street, as Eugenia's mother did, and turning

200 Sup.—9

north at its intersection with Pine street, as she did, she was confronted with this situation to the west (the direction of the approaching train) : on the west side of Pine street, buildings were so located as to hide her view of a locomotive approaching from the west. These obstructions extended to within, say, fifty-five feet of the railroad track—there approaching the crossing on a tangent, as said, from the southwest and making an acute angle at its junction with Pine street. All the testimony shows that the mother drove into Pine street on a slow trot and approached the crossing sitting on the right-hand side of the buggy, with Eugenia on the left or west side. As said heretofore, the top of the buggy was down and it was still daylight. The case proceeds on the theory on both sides that when the buggy got past these buildings and to within fifty-five feet of the track, by looking to the southwest, its occupants had an unobstructed view of an approaching train for a mile or more. It seems there was a switch or "house track" south of the main track at a distance testified to as seven feet four inches, and there was a very slight rise in coming from the south to these tracks.

There is a sharp contention pro and con over the issue of negligence on the part of Eugenia Stotler and on the part of her mother. No light is thrown on this issue from either of them. The mother was of mature years, to-wit, aged forty-five, and her lips were sealed instantly by death. The daughter was picked up nigh unto death and taken for dead—she remaining profoundly unconscious for a day or so, and thereafter remaining in a condition of semi-coma for a long time, gradually regaining the normal use of her senses. Her mind is a blank on the accident. The case was put to the jury on the uncontradicted testimony of plaintiff and her witnesses that she never was able to tell, either before or at the trial, how the accident oc-

curred or what caused it or what her mother or she saw or heard or was doing immediately before or at the time of driving on the track. Eye-witnesses, however, testified for plaintiff on this score. In the confusing anxiety of the moment, these eye-witnesses either did not notice or at least were not called upon to testify as to whether either Eugenia or the mother looked to the southwest after clearing the obstructions on the west side of Pine street. They all agree that the mother alone was driving. Some of them noticed the daughter's arms extended when about to drive on the track and at about the time of the alarm whistle. It seems the horse was slowed down, but not to a full stop, as it got to the switch track, and one of her witnesses noticed that the horse threw its head a little bit to the east at the switch track and testified that Mrs. Stotler whipped the horse at that immediate time. The evidence was undisputed that the engine hit the hind wheel of the buggy and the rim of this wheel was afterwards found on the cowcatcher and the hind part of the buggy was torn away.

On defendants' side, by one witness it was shown that the alarm whistle was given when the horse reached the switch track and the evidence tended to show Eugenia and her mother heard this whistle and stopped and tried to back off and that the horse was then whipped and started in a lope and nearly cleared the main track when the buggy was hit. By another of defendants' witnesses it was shown that a whistle was blown about the cattle guard, say, thirty feet from the crossing, and at that time both of the ladies seemed to be urging the horse and the mother was seen to whip it. Other of defendants' witnesses saw the arms of both were extended, but say only one was driving, and they seemed to be trying to force the horse across the crossing, though Eugenia's part in urging or forcing the horse seems to be a mere conclusion based on her arms being extended.

The engineer, defendant Haines, having testified that he gave the statutory signals at the right time and place, and also that he gave signals calling for a clearance or right of way at the depot and received a return come-on signal from a semaphore there, further testified that the first sight he got of Eugenia and her mother was when he was running about twenty-eight or twenty-five miles an hour and was halfway between the whistling-post and the crossing, *i. e.*, forty rods away. Eugenia and her mother had then got past the obstructions on the west side of Pine street and were about fifty-five feet from the track. He saw they were going to cross and he gave two long and two short blasts of the whistle. He says there was no switch track at the crossing—nothing but a main track; that when he gave these signals Eugenia and her mother looked up the track and saw the engine and stopped close to the main track, turning the horse and heading him east, and he thought they would stand there until he got up and past, but when he got within 200 or 150 feet of the crossing the driver turned the horse's head north again and started across. Thereupon he gave the alarm signal and grabbed for his emergency brake but could not stop the engine in time to avoid the collision, though he reduced the rate of speed to twenty or twenty-two miles and thereafter could have stopped the engine sooner had he not been excited. He said he had seen people drive up as close as that to a crossing and stand there while the train passed but had not often seen them drive up as close as that and stop and had never seen it done at this crossing. He estimated the distance of their stop from the main track at ten feet and says he kept on running while the horse stood there and that when he was about the aforesaid distance away the driver whipped the horse around to the left and went on the track. He further testified that when he got to the corporate limits he put on brakes

and then took them off again and shut off steam and never applied the emergency until he was about 200 feet away when he saw the driver of the vehicle again turn the horse to the north and go ahead; that the horse was whipped with the lines; that when and while it was turned to the east it cleared the track, and that fact was what he was looking for.

The fireman, located on the north side of the engine, did not see the occupants of the buggy, but did see the horse before the collision. He testified the engineer applied the emergency brakes a few feet away from the crossing, say, thirty or forty feet; and further testified, as did the engineer, that they had applied the brakes shortly before reaching Laddonia, and took them off; that such application of the brakes reduces the speed of the train when steam was not worked. He further testified that, going at twenty or forty miles an hour, the train could be stopped in fifty feet.

A brakeman on the train testified he saw the mother and daughter when they came to within twenty or thirty feet of the track, and his testimony was corroborative of that of the engineer. He says the train was running without steam under its own momentum at the time. He saw the women when the train was eighty rods away—at the whistling-post. They then were on the company's right of way on Pine street. They were driving slowly and continued to drive until they turned the horse's head to the east right south of the track, and when they did that the engine was one-half a quarter of a mile away. He further testified that no emergency air was applied then and that the horse was turned north again and started over the track when the train was fifty to one hundred feet from them.

The only evidence directed to the issue of an unfenced track was from one witness that "the crossing there is not fenced;" and from another witness that "the crossing is unfenced on either side."

As said before, it was admitted at the trial that John W. Stotler was Eugenia's guardian and curator. No issue was made over the date of his appointment and no evidence was directed to that fact. There was evidence that a nurse had been employed for Eugenia at five dollars a week, and, as we understand it, this nurse was still in attendance upon her at the time of the trial, and had been for eight months, at five dollars a week. This nurse was employed at the procurement of the guardian who also employed several physicians and surgeons, the value of whose services was shown without objection. It was disclosed that the guardian and curator had paid the nurse $125 on account of her services, but there was no proof that anything had been paid to the physicians and surgeons.

There was no evidence directed to the condition in life of Eugenia Stotler, or directed to her ability or disposition to labor prior to her injury, nor was there any evidence directed to proof that she had performed any labor, nor was there any direct evidence that she would likely have to do so in the future, and no direct evidence she had any estate, except the claim in suit. As said heretofore, it was shown that she would have been sixteen years old in the June next after she was injured in April and that she lived with her mother and brothers in the country on a farm.

The conductor, Wiseman, was in the caboose. He testified that he and Haines had charge of the train. There is a mere scintilla (but no more) of inferential evidence that he participated in the actual running of the train, as it was run, at the time and place in question. That evidence was without probative force and is to this effect: it seems that it was the custom on that railroad for the engineer of a train, due to pass by a station without stopping, to signal to the station agent for a clearance. Haines says he did so signal and that he got a clearance from the station. It seems that he

then glanced back at the conductor to see, presumably, whether the conductor had caught the same signal and understood it as he did.  Having received proof of Wiseman's acquiescence in his going on, he did go on. But there is no evidence that the rate of speed, the signals or any act of negligence charged in the petition or touched by the proof could be laid at the door of any employee except the engineer.

We think the  foregoing statement sets forth the record facts sufficiently for the consideration of all remaining contentions made by appellants, barring an alleged excessive verdict.

(1)   On this record, appellants contend instruction numbered 1 for respondent was erroneous in that it submitted to the jury an issue as to whether the train was being run upon an unfenced track at the time and before it struck her.  This contention is based upon the theory that there was no evidence tending to show the track was unfenced.  But we cannot subscribe to that theory.  A track could not be said to be fenced which had fences running parallel with the track unless closed at the cattle guard.  In this case the testimony was that the crossing was unfenced on either side, i. e., that there were no wing fences.  This being so, the track was unfenced within the purview of the ordinance, and this assignment of error we rule against appellants.

(2)   It is next contended that said instruction was erroneous in that it told the jury that running in excess of eight miles per hour is negligence, "and if you believe that as a direct consequence the plaintiff was injured you will return a verdict for her unless," etc. This assignment is also based on the theory that there is no evidence tending to show that the breach of the ordinance caused the injury to Eugenia Stotler.  In other words, there was no causal connection between the negligence proved and the injury received.  But we

do not so read the record, and we cannot subscribe to that theory; because, even ignoring respondent's testimony and taking appellants' own proof, the fact stands out in bold relief therefrom that if the ordinance had been obeyed the buggy would have cleared the track. And this is so, because going at twenty to twenty-two miles an hour (as the engineer, fireman and brakeman testified they were going at the crossing) the engine struck the hind wheel and hind part of the buggy and it is self-evident the danger would have passed by in the twinkling of an eye. It needs no argument to show that if a train at twenty miles an hour goes 150 or 200 feet and catches the rear part of a buggy, pulled by a horse going in a lope across the track, that if the engine had been running at eight miles an hour or less, in covering the same distance it would have missed the buggy. It is true that whether it would have so missed the buggy had it been running within ordinance speed is a fact that must be shown. But it need not be shown by mathematical calculation or by positive testimony. It is a fact that may be inferred by the proof of other facts upon which the inference naturally arises. This contention has been viewed apart from the issue of contributory negligence presently to be considered, and, so viewed, is ruled against appellants. [Schlereth v. Railroad, 96 Mo. l. c. 515; Keim v. Railroad, 90 Mo. l. c. 321; Prewitt v. Railroad, 134 Mo. 615.]

(3) By instruction numbered 2, given on the prayer of plaintiff, the court outlined the statutory duty on the part of the employees of the railway company in charge of a going locomotive to cause the bell to be rung at least eighty rods from the crossing of a public traveled road or street and to keep said bell ringing until the locomotive shall have crossed such road or street, or to sound a steam whistle at least eighty rods away from such crossing and sound it at intervals until it shall have crossed such road or

street, except in cities, and the jury were told that if they believe that defendants failed to ring the bell or sound the whistle as aforesaid, and that such failure was the direct cause of plaintiff's being struck on said crossing, then you will find for the plaintiff, unless, etc.

By plaintiff's instruction numbered 3, the jury were told that defendant railway company and its agents are not required to sound a whistle while running inside of "cities," nor are they required to sound the whistle and ring the bell also; but if they do either it discharges the duty imposed by law. And the jury were further told that if defendants either rang the bell or sounded the whistle as explained in plaintiff's second instruction, then, they could not find for plaintiff on said second instruction.

(a)    It is insisted that a group of errors were committed in the giving of these instructions, and an elaborate argument is based on the theory that though the signals were not given, yet the failure to give them could not have contributed to the injury, but that the proximate cause of the injury in this instance was the negligence of Eugenia Stotler and her mother. This view of the matter will be taken up when we come to consider the question of contributory negligence, though it may be said the precise contention in hand is somewhat controlled by statute, section 1102, and plaintiff made out a prima-facie case when she proved the violation of the statutes relating to signals and the injury.

(b)    It is next insisted there was no evidence that there was a failure to give the statutory signals, but we do not read the record so. It is true plaintiff's evidence was negative evidence, but so was the fact to be proved a negative fact, and the best evidence of which the case was susceptible from her standpoint must necessarily be negative evidence in its character-

istics—that is, evidence from those who were in a situation to hear and who did not hear. Unless, then, we are ready to adopt the theory that negative evidence must be taken in a forum of reason as entirely overthrown by the positive testimony of those who claim to have given (or heard) the signals, the insistence of appellants cannot be permitted. If a clock be in a room and A. testifies he caused the clock to strike and B., who is in the room or within hearing distance, testifies he heard it strike, and C., located as B., testifies he was watching the clock and noticed it was running, but did not hear it strike, the value of the evidence of A., B., and C. is for the triers of fact and not for the judges of the law. In this case, some of plaintiff's evidence was vague and unsatisfactory, but other witnesses were introduced who were in a situation to hear the whistle if blown and the bell if rung. Their attention was drawn to this train, their ears were open and they heard no sound signals. To ignore such testimony tending to show the non-existence of sounds would be to indirectly ignore in court the very faculty provided by our Maker to establish the existence or non-existence of sound, to-wit, the sense of hearing—a sense that may be intensified by will power (as, for example, by conscious listening) but which in waking hours acts automatically, registers sounds and conveys an impression thereof to the brain and consciousness without any aid of the will. [Murray v. Railroad, 176 Mo. l. c. 189.] The point is ruled against appellants.

(c) It is next insisted that the track for over a quarter of a mile west of the crossing was within the limits of Laddonia, a city of the fourth class; hence, there was no duty to blow the whistle, and the court should have eliminated whistling from instruction numbered 2. In the evolution of the argument it is contended the error was not cured by the third instruction telling the jury there was no duty to blow the whistle

inside of cities, nor was it required to sound both whistle and bell. At this point the argument proceeds upon the notion that the jury should have been enlightened by instructing them on the legal meaning of the word "city" so as to bring the word home to Laddonia. Otherwise, counsel say, the jury would not recognize Laddonia, a modest country village, masked under the swelling and pretentious title of "city."

Counsel proceed upon a misapprehension. The crossing was 1248 feet east of the west line of the town. The case proceeds on the assumption the whistling-post was at the proper place, i. e., eighty rods or 1,320 feet west of the crossing, and, therefore, outside the city limits. So that, it would not have been proper to have entirely eliminated whistling from the instruction.

The insistence that the jury were confused by the use of the word "city" and would not likely apply it to Laddonia unless goaded to that application by the prick of a judicial order is a proposition that entertains, but does not convince, the judicial mind. The men in the box knew as well as court or counsel that the common noun "city" is a generic or blanket term, covering Laddonia, as Babylon or Jerusalem, Amsterdam or Kansas City. The jury knew that one city differeth from another in size even as one star differeth from another in glory. This assignment of error is also overruled.

(4) By plaintiff's instruction numbered 5 on the measure of damages the jury were told, among other things, that they might "consider to what extent, if any, plaintiff's capacity for earning a livelihood will be impaired in the future." The jury were further told that "you may also allow such fair and reasonable sums as you may believe she was compelled to spend for medical treatment and nursing." Defendants insist there was error in both these charges—error in the first, because there was no evidence that Eugenia Stotler had performed any labor of any kind or would likely have to do so in the future, and no evidence that

she will be left incapacitated for physical or mental work by reason of her injuries, and no evidence upon which the jury could compute or determine plaintiff's earning capacity (they being left to a mere guess in that particular); and error in the second charge, in that there was no evidence she had been compelled to pay anything for medical treatment and nursing, and no evidence she had become liable to pay anything to doctors or nurses.

Is there merit in these contentions? We think not. Because:

(a) Take the issue of expenses for medical treatment and nursing. The language of the instruction is "and in addition you may also allow such fair and reasonable sums as you may believe she was compelled to expend for medical treatment and nursing." Narrowly construed, the instruction does not say the jury should return a verdict for medical treatment and nursing merely contracted for and not yet paid. It will be observed the past tense is used and the sums recoverable may be said to be those already paid out, to-wit, $125 to the nurse. But, waiving this view and looking at the instruction broadly as a command to the jury to find in her favor for all sums either paid or for which a liability had been contracted for nursing and medical attention, then the position of appellants is that the guardian and curator in strict law was alone liable personally, and, therefore, an action would not lie in her behalf against the wrongdoer. Defendants' argument proceeds upon the hypothesis that Eugenia was unconscious at the time these contracts were made, therefore, she could not be held to be a minor contracting for necessaries. In considering this assignment, the assumption may be indulged that she had an estate. Her environment, her orphanage and the fact that a guardian and curator was appointed for her by the probate court allow that assumption. Having an es-

Stotler v. Railroad.

tate, it is too plain for discussion that even if her guardian and curator was bound in the first instance for her nurse and physicians' hire, yet he would be entitled to reimburse himself out of her estate for outlays of that character. And that he and she (the one the trustee and the other the beneficiary) as here, may sue in effect to recoup the *corpus* of her estate, diminished by outlays caused by the wrongful acts of defendants, would seem to be self-evident. We dismiss the matter by announcing that we are not willing to erect a scarecrow in the way of summoning aid to an unconscious orphan in dire extremity by holding that the one who summons such aid shall be alone ultimately liable for the expense. The law delighteth not in absurdity, let alone in inhumanity.

(b) It is true the record is barren of evidence that this young girl had theretofore performed labor or was in such straits as to be forced by poverty into labor in the future. The record, however, does show she was strong and healthy before her injuries and hence capable of labor suitable to her age. The evidence further tended to show she was permanently injured, and the proposition to be considered amounts to this in a nutshell: if there be no evidence that a young girl, able to labor, had performed labor, and no evidence of her earning capacity, may she recover damages for permanent injuries which diminish her ability to work in the future?

In times past when Satan, "squat like a toad close at the ear of Eve," spoiled the felicity of the race by his suggestions to that new (and somewhat inexperienced) woman, it was promulgated as a rule that: In the sweat of thy face shalt thou eat bread, till thou return unto the ground; for out of it wast thou taken; for dust thou art, and unto dust shalt thou return. If poor, labor is a necessity. If born with a silver spoon in her mouth, daintily reared and tended upon the lap

of luxury, Eugenia Stotler was none the less subject to the vicissitudes of fortune in that riches make themselves wings, and, moreover, she lay under the wise burden of the great law of nature placing upon her the duty of labor, if so be she would preserve a sound mind in a sound body. We cannot subscribe to the heretical notion that a call to labor is not the common duty of all, in no way impaired or modified by the mere ephemeral incident of wealth.

It was not necessary, then, to prove her need to labor in the future, it being axiomatic that the law does not require a vain or a useless thing to be done, nor does it require proof to establish a thing everyone knows and that proves itself, nor does it require a higher degree of certainty of proof than the particular case admits, and we consider it settled that no witness could possibly enlighten a jury on Eugenia Stotler's need or ability to labor in the future, nor on her future earning capacity.

In dealing with infants of tender years, the rule is that the question of damages for loss of future earning capacity, in the absence of the existence of express evidence, is left to the sound judgment, the experience, the conscience of the jury. [Wise v. Railroad, 198 Mo. 546; Schmitz v. Railroad, 119 Mo. 1. c. 277, *et seq.;* Rosenkranz v. Railroad, 108 Mo. 9; Nagel v. Railroad, 75 Mo. 653; Blackwell v. Hill, 76 Mo. App. 54.]

In speaking to the same point, an approved textwriter (Watson on Damages for Personal Injuries, sec. 514) says: "Where an action is brought by an infant of tender years whose earning ability has been permanently impaired or destroyed, while yet untried and before any practical test of natural capacity was possible, to require evidence of specific pecuniary loss, in any amount, would be to deny a recovery on this ground altogether. The result is that a distinction has been expressly recognized between such cases and cases

where the plaintiffs have been adults. . . . As between the wrong-doer, and the innocent victim of the tort, the former and not the latter should suffer the consequences of any uncertainty in the extent of the loss. Doubts of this nature should be resolved in favor of the plaintiff, rather than of the defendant. It is better to run the risk of giving the plaintiff a little more than is his due, than that of exonerating the defendant at the former's expense.''

. The facts of this case bring it within the reasoning of the foregoing cases and general principles. Therefore, the assignment of error under consideration is disallowed.

(5) Defendants' counsel claim other errors in the giving of plaintiff's instructions and in the modification of their own, which claims have not been overlooked by us, but which on examination we find without substantial merit. The only remaining contention on this behalf calling for attention is this: it is contended that, as a matter of law, under the record facts, plaintiff was herself guilty of negligence. Hence, the court erred in not sustaining a demurrer on behalf of the railway company and in not giving a peremptory instruction. on behalf of Wiseman and Haines. .

In considering this assignment, it may be said that defendants concede the doctrine of imputed negligence is not favored by the courts of Missouri. [Becke v. Railroad, 102 Mo. 544, and a line of cases following that.]

It is further conceded that an adult, so situated as to be unable to perceive his peril, as, for example, A., riding in a close carriage on a dark night, and negligently driven into danger by a hackman, B. (the relation of master and servant not existing between A. and B.), is not guilty of negligence in failing to look and listen or take active steps to prevent his injury. [Sluder v. Railroad, 189 Mo. l. c. 138, et seq.]

The position of defendants is that, regardless of the question of imputed negligence, one who is riding with a driver in an open carriage in daylight, and so situated as to see and hear is not absolved by the negligence of the driver from exercising due care for his own protection. And it is argued that the application of this principle relieves them from liability in this case, notwithstanding their own negligence in the premises.

In a very late case, Fechley v. Traction Co., 119 Mo. App. 358, Goode, J., guardedly formulates the doctrine, thus: "Few, if any, courts have held that an occupant of a vehicle may entrust his safety absolutely to the driver of a vehicle, regardless of the imminence of danger or the visible lack of ordinary caution on the part of the driver to avoid harm. The law in this State, and in most jurisdictions, is that if a passenger is aware of the danger and that the driver is remiss in guarding against it, and takes no care himself to avoid injury, he cannot recover for one he receives. This is the law not because the driver's negligence is imputable to the passenger, but because the latter's own negligence proximately contributed to his damage." [See, also, Holden v. Railroad, 177 Mo. 456.]

The cases mainly relied upon by defendants' counsel were under consideration by Goode, J., in the Fechley case, and the same authorities were substantially under review in this court in the Sluder case, hence an extended discussion of them is not necessary. In the Sluder case, Gantt, J., said for this court In Banc: "We have examined with care the long list of cases cited by defendant to sustain its proposition that the demurrer to the evidence should have been sustained on the ground that while the driver's negligence is not imputable to plaintiff, yet the plaintiff was guilty of negligence in permitting the driver to go upon the track in the face of obvious danger. Without reviewing each

of these cases it must suffice to say that each of them contains some element of express sanction by the injured party of the driver's negligent conduct or some circumstance showing the plaintiff was in a position to see or know the danger to himself and made no effort to protect himself."

In applying the principles of law and conclusions thus enunciated to the facts in judgment, we may be permitted to proceed (whether rightfully or wrongfully) *arguendo,* and by way of assumption, on two hypotheses, both of them very favorable to defendants, *viz.*: *First,* that the mother of Eugenia Stotler could not without blame on her own part drive on the track under the rule laid down in Hutchinson v. Railroad, 161 Mo. 254, and cases cited, in reliance upon the presumption that the railway company was obeying the ordinance; and, *second,* that she was guilty of negligence as a matter of law in driving upon the track in daylight immediately before a rapidly advancing engine, under the rule announced in Green v. Railroad, 192 Mo. 131; Schmidt v. Railroad, 191 Mo. 215; Mockowik v. Railroad, 196 Mo. 550. Let us not be misunderstood. We do not decide the mother's case. That is not here. We only assume, for the purposes of *this* case, she was negligent.

We shall proceed, moreover, on the hypothesis, *arguendo*—the most favorable possible to defendants— that if Eugenia Stotler, at her age, nearly sixteen, had been riding by herself and voluntarily drove upon the track in question and had negligently failed to discover an advancing engine until too late to escape, though for the last fifty-five feet of her journey the track was visible to the southwest for a mile or more, she would have been guilty of negligence, the proximate cause of her injury. [Walker v. Railroad, 193 Mo. l. c. 480, *et seq.,* and cases cited; Spillane v. Railroad, 135 Mo. l. c. 424, *et seq.*] But all these concessions and as-

sumptions, made for the purposes of the case only, do not cast this girl in this case. And this is so, because:

In the first place contributory negligence is an affirmative defense and the burden was on defendant to establish it. In the second place, Eugenia being unable to speak on her own behalf, being left by her injuries as though dead and having no knowledge of the affair, she is entitled to certain presumptions in her favor, and those presumptions are that, in the absence of evidence to the contrary (because of the natural instinct of love of life), she did exercise due care. [Weller v. Railroad, 164 Mo. l. c. 198, *et seq.*; Meadows v. Ins. Co., 129 Mo. l. c. 93, *et seq.*; Davis v. Railroad, 46 Mo. App. l. c. 189; Riska v. Railroad, 180 Mo. l. c. 187; Mockowik v. Railroad, *supra;* Railroad v. Gentry, 163 U. S. l. c. 366.]

Says AGNEW, J., on this point: "The natural instinct which leads men in their sober senses to avoid injury and preserve life, is an element of evidence. In all questions touching the conduct of men, motives, feelings and natural instincts are allowed to have their weight, and to constitute evidence for the consideration of courts and juries." [Allen v. Willard, 57 Pa. St. l. c. 380.] It will be presumed, furthermore, that a traveler, bound to look and listen at a railway crossing, saw what he would have seen had he looked, and heard what he would have heard had he listened.

Now, if this case be viewed from the standpoint of plaintiff's evidence, she is presumed to have looked and listened and to have seen and heard the train. If it be viewed from the standpoint of defendants' evidence, she actually did see the train when it was forty rods away and she was still in a place of safety south of the track. The case, then, has progressed to the point where fault can be found with plaintiff, if at all, not in her not looking and listening, in her not seeing and hearing the advancing train, but in the act of driving

on the track immediately before that train. The act in question was not hers, but if she actively participated in that act, or is responsible therefor, she ought not to recover. If she did not actively participate therein, and is not responsible therefor, then there is no independent cause intervening between defendants' negligence and the injury, and that injury should be referred to defendants' negligence alone.

In considering the matter from this point of view, we lay controlling stress on the following facts: Eugenia was riding with her mother. At her tender years, in absence of evidence to the contrary, it could not be held that she was freed from the dominating influence of her parent — from the natural trait of relying on the judgment and protection of that mother; for no surer does the moon borrow its light from the sun than does a daughter of that age instinctively gather herself like a nestling under the mother's wing. Not only so, but the mother held the reins, she held the whip —she was driving. The proof is conclusive that the mother drove the horse across the track.

If the daughter's hands seemed to be extended, shall we presume from that fact (as some of the witnesses did), that she was urging the horse across? That act looks two ways. Why not assume that in a moment of intense anxiety, on sudden peril, the daughter reached for the lines to check the horse. Nor can we assume in the emergency presenting itself that checking the horse on the track would have been due care, had the daughter been able so to do; nor can we assume, even if she was required (which she was not) to act with presence of mind and coolness of judgment, that jumping from the buggy would have been exercising due care. Nay more, if Eugenia had been either chilled or frozen into speechlessness by the danger she was in, and if (the fates with their shears then and there crossing her path) she had remained dumb like a

lamb before her shearers, or had done nothing except make spasmodic efforts without reason or sense, we would not be willing to say, as a matter of law, she was guilty of negligence. The truth is, she was but a broken branch cast on the stream of the mother's judgment and volition, prone to be borne away on its current; and, under such circumstances, defendants may not acquit themselves by pointing to the mother's fault; they are to be acquitted, if at all, alone on the theory they exercised due care themselves.

Each case must stand or fall upon its own particular facts. In many of the cases in which the question here involved was under discussion and exposition, the traveler — an adult — actively participated in the negligence of the driver. Such, for example, was the Fechley case, *supra*. But we have been pointed to no soundly-reasoned case going to the extent of holding that a girl of the age of Eugenià Stotler, driven by her mother upon a track (the record being silent upon her active participation in her mother's negligence), has been denied recovery under facts and circumstances such as are before us, and we take such doctrine to be bad law.

Without burdening this opinion with quotations from cases, we think the reasoning of the following (with many others) sustains the views here expressed, some to a greater, and some to a less extent: Railroad v. Eadie, 43 Ohio St. 91; O'Toole v. Railroad, 158 Pa. St. 99; Pyle and Wright v. Clark, 75 Fed. 644; Railroad v. Johnson, 163 Ind. 518; Howe v. Railroad, 62 Minn. 71; Railroad v. Biedler, 98 Md. 564; State of Maine v. Railroad, 80 Me. 430; Cahill v. Railroad, 92 Ky. 345; Hoag v. Railroad, 111 N. Y. 199; Railroad v. Steinbrenner, 47 N. J. L. 161; Railroad v. Gibson (Texas), 83 S. W. 862.

V. Defendants insist the verdict is excessive. It will not be necessary to spread (and thus preserve)

permanently on our records the details of the serious injuries suffered by Eugenia Stotler in broken bones, wounds, scars and inward hurts. Suffice it to say that her injuries were serious and permanent, and we find no cause to disturb the verdict on that account.

VI. As said heretofore, there was no evidence of any probative force tending to show that the conductor, Wiseman, was guilty of negligence. In this condition of things, the learned counsel having charge of defendants' case, *nisi*, did not ask an instruction directing a verdict in favor of Wiseman, nor did he demur to the evidence on his behalf. He contented himself with offering an instruction directing the jury to find for both Wiseman and Haines, which, in that form, was properly refused. The case seems to have been tried on the theory that if the engineer was guilty of negligence, the conductor was also negligent—that they were in the same boat and must meet a common fate. In this condition of things we are met with the contention on appeal that the judgment must necessarily be reversed because there was no evidence to sustain a verdict against Wiseman. It is doubtful whether we should consider this contention sound in the face of the axiom of appellate procedure that a cause should be tried on appeal upon the same theory it was tried below. [Bensieck v. Cook, 110 Mo. l. c. 182-3.]

But, waiving the point, we consider it established on reason and authority that we may reverse as to one tortfeasor and affirm the judgment as to others. [R. S. 1899, sec. 866.] The earlier doctrine was to look on a judgment as an entirety and to be reversed as to all, if reversed as to one. But the later and better rule is to go deeper than the mere shell of the judgment and look into the nature of the case itself, and where the interests of parties to an appeal may be rightfully severed, where the errors do not affect the parties jointly and where the rights of one party are

not dependent upon those of another, then, it is not necessary to reverse the entire judgment. [Elliott on Appellate Procedure, secs. 574, 575.]

The case at bar comes within the foregoing rule and the doctrine of this court is well established that in such case the judgment may be reversed as to one party and affirmed as to other parties. [Finkelnburg & Williams, Missouri Appellate Practice (2 Ed.), pp. 121, 122; Belkin v. Hill, 53 Mo. 1. c. 496-7; Cruchon v. Brown, 57 Mo. 1. c. 39; Crowe v. Peters, 63 Mo. 429; Mansfield v. Allen, 85 Mo. 502; La Riviere v. La Riviere, 97 Mo. 84; Orr v. Rode, 101 Mo. 387; Sparks v. Transfer Co., 104 Mo. 548; Kleiber v. Railroad, 107 Mo. 240; State ex rel. v. Tate, 109 Mo. 265; Neenan v. St. Joseph, 126 Mo. 89; Evans v. Kunze, 128 Mo. 670.]

We are of the opinion there is no reversible error in the case as to defendants Haines and the railway company, and that the judgment should, therefore, be affirmed as to them, but reversed as to the defendant Wiseman. It is, accordingly, so ordered.

All concur.