GOING *v.* DETROIT, JACKSON & CHICAGO RAILWAY.

RAILROADS—NEGLIGENCE—DISCOVERED NEGLIGENCE — QUESTION FOR JURY.

In an action against a railway company for the alleged wrongful killing of plaintiff's decedent, a soldier in the United States army, who was struck by defendant's interurban car as he was running alongside the track in the same direction the car was going, for the purpose of overtaking a motor truck, the driver of which he had been ordered to relieve, where there was testimony that

the car was more than 700 feet away when decedent jumped from the motor truck on which he was riding, and ran from 100 to 150 feet, and that no effort was made by the motorman to stop the car or sound an alarm before decedent was struck, the question of defendant's discovered negligence was a question of fact, and the trial court was in error in disposing of it as a matter of law.[1]

Error to Wayne; Merriam (De Witt H.), J. Submitted October 24, 1924. (Docket No. 159.) Decided April 3, 1925.

Case by Mabel A. Going, administratrix of the estate of Charles Henry Going, deceased, against the Detroit, Jackson & Chicago Railway for the negligent killing of plaintiff's decedent. Judgment for defendant *non obstante veredicto*. Plaintiff brings error. Reversed, and judgment ordered entered on the verdict.

*William N. Warren* (*Murat Boyle,* of counsel), for appellant.

*William G. Fitzpatrick* (*William E. Tarsney,* of counsel), for appellee.

MOORE, J. Plaintiff brought suit as administratrix of the estate of her brother, Charles Henry Going, deceased, to recover damages on account of his death on February 24, 1919, which occurred as the result of deceased being struck by an interurban car of the defendant, on Michigan avenue, near Dearborn, Michigan. Defendant's motion to direct a verdict in its favor, made at the close of the plaintiff's case, and renewed at the close of the testimony, was reserved under the Empson act. The cause was submitted to a jury in a charge covering 14 pages of the printed record. Plaintiff had verdict and the reserved motion was resubmitted to the court on oral argument and granted.

---

[1]Railroads, 33 Cyc. p. 903.

Michigan avenue runs in an easterly and westerly direction from Detroit to Ann Arbor, Michigan, and at the place where this accident occurred there is a cement roadway for vehicular traffic.   To the north of this cement or concrete roadway the right-of-way of the Detroit, Jackson & Chicago Railway is situated, with tracks thereon, upon which the defendant operates interurban cars.   Between the railway tracks and the concrete road is a strip of land, consisting of gravel and dirt, which does in effect enlarge the concrete roadway for vehicular traffic up to the rail of the tracks.   This gravel strip is in the neighborhood of three feet wide.   On the day in question, the deceased, a soldier in the United States army, was accompanying a motor transport train from Fort Wayne, Detroit, Michigan, to Fort Sheridan, Chicago, Illinois.   This army motor transport train was proceeding in a westerly direction on Michigan avenue, and consisted of, approximately, 27 motor trucks. The sergeant in charge of the transport train ordered the deceased, who was riding on one of the rear trucks, to dismount and go forward to the truck that was leading the train to relieve another driver who was not feeling well.   Upon being so ordered by the sergeant in charge, the deceased dismounted from the truck upon which he was riding to the ground, and, the testimony shows, without looking back the deceased jogged along in a westerly direction beside the transport train, along on the gravel strip of the roadway between the concrete road and the car tracks; an interurban car approached from the rear and struck him on the right side, the impact causing him to be pushed under the front wheels of one of the motor transport trucks, which injuries later caused his death.

The trucks were traveling partly on the concrete highway and partly on the gravel, and as near the

railway track as they could in order to enable the traffic, which at this point was very heavy, to meet and pass.    The case is brought into this court by writ of error, and the question is whether it was error to set aside the verdict of the jury and enter a judgment in favor of the defendant.    This involves an examination of the evidence.

Mr. Hartley, a sergeant, was in charge of the train and was a witness.    After giving his order to Mr. Going, Mr. Hartley dropped off the truck and stood in the highway waiting for an automobile to pick him up and take him to the head of the train.    He was standing in the highway about 400 feet from the rear truck when the accident happened.    We quote some of his testimony:

"The motor trucks were at different intervals apart, some 100 feet, some 50, some 25, and some as close together as 12 or 15 feet.    They were traveling on the extreme right of the road.    Preceding the accident, Mr. Going was on the third truck forward from the rear.    The truck he was riding on was towing another truck.    *    *    *    When I got off I stood three and a half or four feet away from the defendant's track.    I saw Private Going get off the truck. It had gotten 250 feet or 300 feet ahead before he stepped off.    *    *    *    When Going alighted he got off on the right-hand side.    *    *    *    He was running in very close to the rail, looked to me as though he was running right alongside of the rail.    He ran along that space beside the truck before he was struck by the car a distance of 150 feet or more.    During that time, I did not observe any change in his position or his relative position to the track.    *    *    *    He just took a straight course as if he was guiding himself by something.    This entire space between the truck and the car rail was between two and a half and three feet.

"When he got off the truck no street car was in sight.    You could see down the track to the east 800 or possibly 1,000 feet.    The car that came up was going west.    I did not see it before it got to me.    I

was standing between 3 and 4 feet of the track when the car passed me.

"*Q*. Did you hear any whistle or bell from the car before it passed you, or as it approached you?

"*A*. I did not hear any sound at all; the fact is, the car was so close on to me, went by so fast it frightened me, at the moment, and I would have stepped out further in the road; it was right on me before I knew there was a car in sight.   I have driven automobiles the last 8 or 9 years and drove during the 4 years I was in the army.   I was a driver for different officers down on the border for a long time.   I have ridden on trains quite a bit and street cars.   I should say that car was running at 45 miles an hour when it passed me.   I observed Mr. Going immediately after the car passed me. * * * Going was jogging alongside of the track.

"*Q*. Now you may tell the jury whether that car rang any gong or sounded any whistle from the time it passed you until it struck Mr. Going down there?

"*A*. I heard nothing; I heard no sound from the car when it came by me, or after it got by me; I heard no kind of a signal from the car. * * * The car struck Mr. Going's right shoulder in the back.   I did not observe any slackening of the speed of the car before it struck him.   I would say the street car ran 500 feet after it struck him, and before it stopped.

"As our truck train was proceeding along there we had to be to the extreme right; if you was not it would crowd the cars on the other side, especially the eastbound cars.   We were over far enough so east and west-bound automobiles could pass the truck train. That was our object; we had orders from the commanding officer of the train to bear to the right as much as we could in order to keep from interfering with traffic going east and west. * * *

"*Q*. Mr. Hartley did you at any time hear any bell or gong or whistle from that car that struck Mr. Going?

"*A*. As I stated, the car was on me before I knew there was a car in sight, frightened me at the time, and I stepped out and naturally I seen the train ahead, but I did not hear any whistle or any gong or anything from the car, or any signal.

230—Mich.—4.

"*Q.* You may state whether or not you were watching the car that had passed you, as it approached Mr. Going?

"*A.* I did, because I just stepped out of the way, and the speed it was going, I naturally watched it pass my train, approach my train."

Mr. Pickens, who was on the last truck, saw Mr. Going alight and testified about his running straight ahead for 100 or 150 feet.    We quote:

"I did not hear this car before it passed me.    I did not hear any whistle or bell or gong or warning of any kind of the approach of that car.    When it passed me and struck Mr. Going it looked to me to be running between 40 and 50 miles an hour."

Mr. Stokes saw Mr. Going get off the truck; we quote:

"When Going got off the truck he stayed on the step for probably a half a minute or two and alighted and ran alongside the truck for probably a distance of 100 or 150 feet at about the same gait the truck was traveling.    Then the interurban car came along, traveling at a terrific rate of speed—I would estimate at about 50 miles an hour, and without any warning struck the lad on the right side.    I did not hear any whistle or bell on that car at all as it approached and passed me.    After it passed me and before it hit him, I did not hear any bell or whistle or gong.    As he was trotting along there in that space between the truck and the street car tracks his right-hand side was just about even with the south rail of the street car tracks.    He did not change his position so far as his distance from the track was concerned to any considerable extent during the time he ran along but traveled pretty straight ahead.    The car ran after it struck him and before it stopped I would judge about 500 or 600 feet."

Mr. Gillman, who was assistant truck master in charge of a section of this train of trucks, testified:

"I was supposed to keep the trucks together—each third of the train ran as a unit—they were supposed

to be kept together and kept in order.    I kept a lookout up and down the line.    * * *   I did not see Mr. Going get off the truck.    When I saw him he was running alongside of the truck, jogging along. I was sitting on the side of the truck I was riding on next to the street car track on the right-hand side of the truck.    I was not driving.    I looked around because that was my business to be on the lookout for anything that might occur—I was supposed to look up and down the train and see that the trucks did not separate.    When I looked around and saw Mr. Going trotting along beside the truck there he was about a foot or a foot and a half from the street car track. When I first saw him I could see the car too.    At that time the car was about 1,000 feet away.    I continued to observe him.

"*Q.* And as this car approached you may tell the jury whether or not it sounded any whistle or warning.

"*A.* I did not hear it; I do not believe it sounded any whistle.

"*Q.* Did you at any time after this car got close to this boy make any effort to attract his attention?

"*A.* Yes, when I saw that he was in danger I tried to attract his attention—I yelled and waved my hand— I could not attract his attention.

"*Q.* Did he change his position in any way as the car approached or did he continue to trot in about the same place?

"*A.* He continued trotting along the same way.    The truck train at that time was moving not any faster than 8 miles an hour.    I could not tell that this interurban car slowed down as it came up there and struck this boy.    The car passed me.    I could not tell that it had slackened its speed any when it passed me.    I have driven automobiles over ten years and when I see an automobile or street car running I believe I can give a fair estimate of its speed.

"*Q.* Now will you tell the jury what your best judgment is as to the speed of that street car as it approached and struck that boy that morning?    * * *

"*A.* Forty or fifty miles an hour.    This car was about 700 feet away when I began to make an effort to attract Mr. Going's attention in some way.    From that time until it struck him I was watching it pretty close."

There was other testimony of a like import.

Before the defense offered any testimony its counsel made a statement of what they claimed, from which we quote:

"The only point where we part is on this particular proposition 'from the plaintiff's story it would appear that the car was some distance to the rear of Mr. Going as he got off the truck, and it would also appear from the plaintiff's recital that Mr. Going ran along the narrow space between the concrete road and the car tracks for a distance of, variously estimated, from 100 to 150 feet, and while he was still running along the interurban car was to his rear quite some considerable distance.'    Now from there on, at that particular point, is where we part.

"On behalf of the defendant, it will appear that the motorman, a gentleman by the name of Mason, operating this particular car, saw Mr. Going as he was in the act of stepping out of the cab of this particular motor truck; he saw Mr. Going as he was in the act of stepping out of the cab onto the running board and onto the ground, but rather than being at that time a considerable distance back, as the plaintiff's story would lead you to believe, Mr. Mason says that his car was within a very short distance,  *  *  *  if I correctly recall, some 75 feet back and just as soon as he saw this young man get on to the running board down went the bell cord, or the cord that operates the bell, the electric whistle, or, rather, the whistle, and although he used the appliances at hand in an effort to bring that interurban to a stop and avoid striking him.  *  *  *  That this interurban was operated at a high rate of speed; it is true, and we concede that the tracks are located a distance, approximately, three and a half feet from the concrete road.    Now, I say to you the only point where we differ as to how this accident happened is with regard to the location of the interurban when Going got off that truck.

"Now, if from the testimony, you gentlemen believe that the interurban was 'way back and that the motorman ran on and brought about the injury to Mr. Going, then your conclusion might be to hold us re-

sponsible. If, however, you believe that Going alighted from the truck at the time the motorman says he did and believe in detail the motorman's statement how this accident happened, then there can be no liability on the part of the defendant company.

"Now, it is only, frankly speaking, gentlemen, it is only on that one point that there is any particular disagreement."

The conductor was called as a witness by the defense. He did not see the accident, but knew when it occurred and immediately got busy with his red flag to flag the following section.

We quote some of his testimony on the cross-examination:

"These cars had a whistle on them for giving warning. I guess you could hear it a mile. It is operated by compressed air. In order to sound that whistle the motorman just pulls the cord that hangs on the side of the front window, and as long as he hangs on to that cord the whistle sounds. He can sound a long blast, or a series of short blasts, regulated any way he wants to. I would not say it is a shrill whistle but it is a whistle that can be heard a considerable distance provided there is not any other noise. I would not say that I heard the whistle that morning, but I very seldom pay attention to the whistle. * * * I would say we had near to forty passengers on that car."

The motorman testified for the defendant. His version is as follows:

"*Q.* Now, tell these gentlemen just how the accident happened, as you saw it.

"*A.* Well, we was on express train going west, and when we got to the other side of Bender road there was some trucks going along the road in the same direction I was going, and was pulling one truck behind another, and when I got somewhere within 50 or 100 feet of them this young man stepped off of the running board of the back truck right along the edge of the track, and the corner of the car struck him on the shoulder and knocked him down and the

truck ran over him—and the truck he jumped off of ran over him.

"Michigan avenue runs approximately east and west. My train was bound west going out. The automobile trucks were going west. There was only two I seen, that is right at this particular place; of course, they were strung along Michigan avenue; I had passed several before this and a few after it, if I remember right. After our car left this last stop previous to the accident I cannot tell exactly how fast I was operating, somewhere between, I suppose 35 and 45 miles an hour. * * * I saw the young man get off the truck. He just got up out of the seat and stepped on the running board and stepped down. He never looked around, he just continued facing to the west, never turned his head. At that time when he got off the truck my car was about 50, between 50 and 100 feet behind him when he stepped down. When he stepped down I shut the power off and set the brakes and blew the whistle. In order to blow the whistle you would pull the whistle rope. It is right there at your hand directly in front of you as you set in your seat in the motorman's vestibule. To shut off the power I shut off the controller. I reversed the car about the same time. The young man did not do anything only kept trotting along the side of the rail. He did not go very far. I do not suppose he went over ten or twelve steps, maybe something like that after he got off. I blew the whistle all the time. The young man just continued right along the side. He did not change his course at all, he could not. * * * It is about 700 feet from where my car struck the boy to where it came to a stop."

The record shows the interurban car was so crowded with passengers that some of them rode on the rear platform. One of them, a student, was called as a witness by the defendant. We quote some of his testimony:

"I was standing on the back of the car on the platform. There were others standing with me. The seats in the car were all taken and there were some standing. * * *

"The interurban car was going towards Ann Arbor.

This car stopped at a point some distance from where the accident happened.    We were passing at the time this motor convoy, if that is what you call it, a number of trucks going out of the city.    As I remember there was quite a string of trucks.    I should imagine there were 10 or 12, might have been more, all motor trucks.    There was one being towed.    Our car was in the act of passing them when I observed them.    I did not see him the moment he was injured.    As I was standing on the back of the car and leaning up against the side I felt the thud that something was hit, and naturally all I had to do was to look out to my left and see the body as it was hurled in front of the next truck behind going on his side.    The car was going fast.    The interurban car ran a matter of four or five hundred feet before it was brought to a stop.    *    *    *

"*Q.* Let me ask you this, Mr. Wickham, do you know whether or not any bell or whistle or warning of any kind was given of the approach of this interurban?

"*A.* I do not remember; I did not see this young man get off the motor truck.    *    *    *

"*Q.* Did you notice any checking in the speed of the car just previous to hearing the thud that you spoke of?

"*A.* I do not remember.

"*Q.* I think you said that you do not recall whether or not a gong was rung?

"*A.* I do not remember.    The trucks were traveling close together.    I did not notice whether they were loaded."

These three were all the witnesses called by the defendant who knew anything about the accident.

It is very strange that a whistle which the conductor says could be heard a mile away should not, if blown, be heard by the conductor who was in the car, or by the passengers who were on the rear platform, or by any one of the forty or more passengers in the car, or by the five or six witnesses who were connected with the movement of the convoy of trucks, and who were passed by the interurban car when they were not more than six to ten feet from it, and were in a position to

hear if the motorman had done as he testified: "I blew the whistle all the time." It will be noticed that the motorman testified that he saw Mr. Going when he stepped down from the running board, and that his interurban car "was about 50, between 50 and 100 feet behind him when he stepped down" and that "he did not go very far, I do not suppose he went over 10 or 12 steps, maybe something like that after he got off." It has already appeared that all the other witnesses who testified upon that subject, and there were a number of them, testified the interurban was more than 700 feet away when Mr. Going left the truck, and that he traveled from 100 to 150 feet before he was struck.

Some of the authorities germane to such a situation are 1 Wigmore on Evidence (2d Ed.), § 664; Jones on Evidence in Civil Cases (3d Ed.), § 898; *Crane* v. *Railroad Co.*, 107 Mich. 511; *Lonis* v. *Railway Co.*, 111 Mich. 458. Justice FELLOWS reviews the cases in *Lambert* v. *Railway Co.*, 209 Mich. 107. See *Stotler* v. *Railway Co.*, 200 Mo. 107 (98 S. W. 509). See, also, *Montgomery* v. *Railway Co.*, 103 Mich. 46 (29 L. R. A. 287); *Tunison* v. *Weadock*, 130 Mich. 158; *Bedell* v. *Railway*, 131 Mich. 668; *Labarge* v. *Railroad Co.*, 134 Mich. 139; *Calvert* v. *Railway*, 202 Mich. 311; *Kelley* v. *Keller*, 211 Mich. 404; *Bewernitz* v. *Railway*, 195 Mich. 528 (L. R. A. 1917E, 767); *King* v. *Railway Co.*, 176 Mich. 645.

We think the question of the discovered negligence of the motorman under the evidence given was a question of fact, and the case should not have been disposed of as a matter of law. The case will be remanded with instructions to reinstate the judgment entered upon the verdict. The appellant will recover costs.

McDONALD, C. J., and CLARK, BIRD, SHARPE, STEERE, FELLOWS, and WIEST, JJ., concurred.