[No. 29875. *En Banc.* January 10, 1947.]

DORIS FERGUSON *et al., Respondents,* v. THE CITY OF SEATTLE, *Appellant.*[1]

[1]Reported in 176 P. (2d) 445.

*A. C. Van Soelen* and *Arthur Schramm,* for appellant.

*Riddell, Riddell & Hemphill,* for respondents.

ROBINSON, J.—This is an appeal from a judgment entered on a verdict in a personal injury case. It might well be called a borderline case were it not for the fact that the principal question involved lies in a field wherein there is no defined border line. That question is: Was the verdict arrived at through legitimate inference from evidence or by mere speculation? That is one of the most difficult questions which can be presented to an appellate court, since, in the absence of a definite boundary between these two methods of arriving at a conclusion, what one man classifies as legitimate inference is very apt to be regarded by another as mere speculation.

The preliminary facts are clearly established: Mrs. Ferguson, who, throughout, will be referred to as though she were the only plaintiff and respondent, was run down and very severely injured by a Seattle municipal bus on December 27, 1944, somewhere near the southeast corner of Fourth avenue and Jackson street.

For some months she had been employed by a fur company located in the Roosevelt hotel at Seventh avenue and Pine street. Her husband was employed at a steel works some distance south of the point where the accident occurred. The Fergusons lived in West Seattle. It had been the custom of Mr. Ferguson to drive his wife a part of the

way to her work. He ordinarily took her north on Fourth avenue as far as Jackson street. She then alighted at the southeast corner of the intersection and waited for the northbound Fourth avenue bus, while her husband turned right and went east on Jackson street to Fifth avenue, there again turned right and drove south on his way to his place of employment.

On the morning of the accident, it was impossible to follow the route above described. Fifth avenue was closed to traffic because of street repairs. It was necessary for Ferguson to turn left on Jackson street and get back to Fourth avenue by again turning left at the Second avenue extension. He could not discharge his wife at her bus stop, since, as he was going to turn to the left, he was compelled to remain in the left-hand traffic lane and, therefore, could not pull over to the right-hand curb. Mrs. Ferguson alighted on the north sidewalk of Jackson street after her husband made the left turn. She testified in this action that she had no recollection whatever of anything that happened thereafter, nor until she became conscious in Providence hospital. We may here say, parenthetically, that there was ample medical evidence to the effect that this was entirely possible.

Although the time interval is not established, shortly after the plaintiff got out of her husband's car, she was lying in Jackson street twenty-one or twenty-seven feet easterly of the east line of the Fourth avenue east crosswalk, and from four to six feet from the south sidewalk line of Jackson street, with the right front wheel of a city bus resting on one of her legs, her head pointing southerly and away from the bus. The testimony as to how she got there and when she got there is extremely vague and uncertain. It is plain that, to reach her bus stop, there were open to her two different routes of equal length. She could cross Jackson street on the west Fourth avenue crosswalk and then cross Fourth avenue itself on the Jackson street south crosswalk, or go east across Fourth and south across Jackson. It is contended that she took the latter course, and that contention is wholly founded upon the following testi-

mony, and no other. After testifying that her husband let her out on the north side of Jackson street just west of Fourth avenue, she testified as follows:

"Q. What were you going to do then, Mrs. Ferguson? A. I was going to catch a bus. Q. Going in which direction? A. *I was going to cross Fourth Avenue, going east, and then Jackson Street, going south.* Q. And you were going to get the bus where? A. Right by the depot." (Italics ours.)

Almost immediately after so testifying, she further testified as follows:

"Q. Tell the jury what happened so far as you know? A. I got out of our car. Q. Do you remember anything after that? A. No, I do not."

Still later, while under cross-examination, she testified:

"Q. After you got out of the car on the northwest corner of Fourth and Jackson you have no recollection of anything until you awoke in the hospital, is that right? A. That is right. Q. You don't remember crossing to the east, crossing Fourth Avenue to the east? A. No. Q. Or starting across Jackson Street to the south? A. No."

It is said in respondent's brief:

"The wife testified that upon leaving the automobile it was her intention to walk from the Northwest corner of 4th and Jackson to the Northeast corner, and then to the Southeast corner to the bus stop where she would catch her bus. She has no recollection, however, of anything that occurred after she left the automobile. *But her husband testified that as he was about to re-enter 4th Avenue South from 2nd Avenue Extension, he looked back and saw his wife at the northeast corner of 4th and Jackson and saw her 'starting across the intersection.'*" (Italics ours.)

Presumably, respondent's counsel made that same contention upon the argument of the city's motion for judgment notwithstanding the verdict; for the court's memorandum opinion denying the motion is made a part of the record, and in it we find the following statement:

"The husband testified that as he proceeded, he looked back and saw his wife leaving the north curb at the northeast corner to proceed across Jackson Street on the east

line of Fourth Avenue South; that it was about eight o'clock at the time she left his automobile."

We are unable to reach that conclusion from the transcript of the evidence. A most careful examination of Mr. Ferguson's testimony, which in its entirety is but four pages in length, shows that it does not support that statement, nor the statement made by respondent's counsel in their brief. The following is the only testimony given by Mr. Ferguson which bears on the matter. After describing the course he took and explaining where he let his wife out of the car, Mr. Ferguson testified as follows:

"Q. *Just take the pointer, Mr. Ferguson, and show on the map the directions you went there and where you let her off.* A. I stayed right on the inside lane on Fourth Avenue South and made a left turn *right here* and then came back over and let her off *right here* as soon as I could stop, and then I came back out *here* and made a left turn and checked with the police later, and it was legal. MR. SCHRAMM: Just a minute. Q. Just tell what you did. You haven't any right to say anything else. A. All right. I made a left turn and came back to Second and came into Fourth Avenue *there*. Q. When you got there did you look any direction? A. Yes. I looked back *here* at the traffic coming south, heavy traffic at that time. It goes out to Boeings. Q. Did you see Mrs. Ferguson? A. I did. I saw her starting across the intersection. Q. Then what happened? A. Well, I just got a clear spot in the traffic and drove on down Fourth Avenue." (Italics ours.)

At the *En Banc* hearing in this case, it was argued that the witness pointed to the east crosswalk of Fourth avenue. Respondent's attorney said that he did, but this court cannot treat such a statement as evidence. Can we legitimately conclude that Mr. Ferguson did so point, by analyzing his evidence, as above quoted? We think it highly probable, in fact reasonably certain, that, when he said, "I stayed right on the inside lane on Fourth Avenue South and made a left turn *right here*," he pointed out on the map the place where he turned; and so, when he testified, "and let her off *right here*," and so, also, when he said, "and then I came back out *here* and made a left turn," and so, also, when he

said that he "came back to Second and came into Fourth Avenue *there*," and further, when he said, "I looked back *here* at the traffic coming south." We requote the testimony which follows:

"Did you see Mrs. Ferguson? A. I did. I saw her starting across the intersection. Q. Then what happened? A. Well, I just got a clear spot in the traffic and drove on down Fourth Avenue."

It will be noted that he did not use the words "here" or "there" which are relied upon as establishing that he used the pointer in the other five instances. He merely said, "I saw her starting across the intersection." We cannot expand the testimony in the record by supplying either of those words.

By a liberal interpretation, the testimony, above quoted, may, perhaps, be regarded as evidence that the witness saw his wife coming south across the intersection. But on which crosswalk? The case does not turn on this point alone, but it well illustrates the factual uncertainties which constantly confront us at every stage of the record. As to one thing after another, the evidence is indefinite. There is no direct evidence in the record that the plaintiff actually crossed Fourth avenue and was thereafter struck down while crossing Jackson street on the east Fourth avenue crosswalk. If that is to be found as a fact, it can only be done by inferring or assuming that she must have done what she intended to do before she got out of the car.

No witness testified in this case who saw the accident, unless it can be said, upon evidence to be presently quoted, that the bus driver saw it. He had come down Fourth avenue from the north.

"Q. When you arrived at Fourth and Jackson, tell us what occurred? A. Well, I pulled up by the stop sign there at Jackson Street behind an orange Kenworth bus, a long, older bus we have. If I'm not mistaken, that came from Boeings. It was going to the barn the same as I was. I waited behind. When the light turned green, he started across. I waited there for him to pull across, and then the traffic. He beat the traffic across. He went ahead of the traffic. I waited there for the traffic to clear, because I

didn't want— I was taking precautions there; and after the traffic cleared while I waited there— I wouldn't say how long; I don't know— I waited there for seven or eight cars to pass, and then there was a break in traffic. And then I started across. On those types of busses they change speeds at twenty miles an hour from a fluid drive to direct drive. You have no control over it. You press on the power pedal, and as soon as she changes—reaches twenty, she changes. I wasn't using the full power pedal. Generally you do when starting out. I was easing her across the street. After I got across the pedestrian crossing—I wouldn't say clear across; the tail of the bus might have been in the pedestrian crossing. I wasn't looking backward. There was taxicabs in the Union Station. There is quite a big stand. They move in and out. They do not allow other people too much right-of-way. Traffic was coming up Fourth Avenue pretty fast. I was watching that. Also I was watching the front of the bus. There was nobody in it. Before I started across the street I looked in the pedestrian crossing. I looked both ways. There was nobody in the pedestrian crossing. When I entered the pedestrian crossing I didn't see anybody, and after I left it, as far as that goes; but after about twenty-eight feet away, out of the pedestrian crossing in front of the bus I felt an impact of some kind. I thought I seen something brown. I thought it was a woman's hat. I don't know what made me think that or anything. Anyhow, it dropped in front of me. It didn't fall; it just dropped this way, across in front of me. I immediately applied the brakes and opened the front doors and stepped out; and Mrs. Ferguson was lying there with her left *front* foot underneath the front wheel of the bus. The bus was resting on top of this left leg. Her other leg was pretty close, close together. Well, anyhow, you could see where her stockings slid *about that far*. I imagine I stopped the bus right on her leg." (Italics ours.)

(Upon further interrogation, he explained that the words which we have italicized in the above quotation, "about that far," meant between a foot or a foot and a half.)

At another time, while under cross-examination, the bus driver testified as follows:

"Q. Mr. Taulbee, from the time you saw the blur or this brown object at the northeast corner of the bus until you saw Mrs. Ferguson lying underneath the bus on this side, do you know how she got—or did you see how she got

from that point down to here? A. Well, she went across the bus— Well, I can't say— I can't say for sure whether I seen it or not, but it seemed to go off toward the right in, across in front of me. In other words, she went straight down in front of me toward the right."

It may be interpolated at this point that a military policeman, who was one of the first persons to arrive at the scene of the accident and was called as a witness by the plaintiff, testified, in part, as follows:

"Q. Did you ask the bus driver how the accident happened? A. Yes. I asked him, but he— Q. What did he say? A. He said he didn't know, except he seen a blur on the left side."

There is a great deal of discussion in the briefs as to how far the plaintiff was lying from the east line of the east crosswalk. Respondent claims the evidence shows twenty-one feet; appellant claims, twenty-six. The bus was thirty-three feet in length, and it is six feet four and a fraction inches from the front axle to the front of the bus.

Some of the witnesses testified that the rear of the bus was east of the east line of the crosswalk. After the bus had been pushed back a short distance to get the right front wheel off plaintiff's leg, it was photographed. It is plain from this photograph that the front axle was then directly in line with an expansion joint in the cement pavement which runs north and south parallel with the crosswalk. There is undisputed testimony that the expansion joint is twenty-five feet from the east line of the crosswalk.

It is contended that the jury could find that the plaintiff was struck while on the crosswalk, on the theory that it could conclude from the evidence that the plaintiff was thrown for a considerable distance and dragged the rest. Her shoes are in evidence, and the finish is entirely scratched off above the heels. Her stockings are also in evidence, and those parts of them which cover the calves are shredded. Plaintiff's physician testified that the skin on the calves of plaintiff's legs had the appearance of having been violently rubbed with rough sandpaper. In the case of one, this was so marked that for a time it was thought that skin grafting

would be required. Furthermore, as hereinbefore stated, the driver testified to a drag mark a foot to a foot and a half in length. Another witness testified: "I saw the marks under the bus. I don't know whether they were skid marks or what, like something had been drug. The pavement was clear where it was drug." When asked about this on cross-examination, he testified as follows:

"Q. But you did see a wheel mark? A. Yes. Q. How wide was that wheel mark? A. About like that. Q. What would you say that would be? A. Twenty or twenty-four inches. Q. About twenty-four inches wide, and how long was it? A. Well, I would judge about six foot. Q. Six foot long? Where was the bus standing at the time? A. The bus was standing facing up Jackson Street."

There is testimony by a witness for the appellant, as follows:

"Q. Did you observe any marks under or in front or in back of the right front wheel? A. Yes. Q. What marks? A. There was a mark partially outlined by dust for about four feet. This was the width of the tread of the right front wheel. The wheel itself was standing about midway of that mark."

We have now reviewed the evidence which is relied upon as entitling the jury to find that the plaintiff was struck while upon the east crosswalk. There is no evidence that the plaintiff used that crosswalk. That, if found, can only be found by assuming that plaintiff *must* have done what she intended to do before she alighted from the automobile. There is no evidence as to what course she followed, or how long after she alighted, the accident happened. All the evidence the jury had bearing on these points is that of her husband, to the effect that, after he had driven the two sides of the triangle made by Fourth avenue, Jackson street, and the Second avenue extension, and got back into Fourth avenue, he saw the plaintiff starting across the intersection, but from what point or in what direction or on what crosswalk he did not state.

But if we assume that the jury could find that the plaintiff crossed Fourth avenue and started across Jackson on

the east crosswalk of Fourth avenue, could it further find that she was run down while on the crosswalk? To do so, it would first have to disregard the evidence of the bus driver and also account for plaintiff's presence about twenty-five or twenty-seven feet east of the east line of that crosswalk. It is suggested that she may have been thrown that distance. That is not an inference from any known fact, but clearly a mere speculation. However, it can reasonably be inferred, from the condition of her shoes, stockings, and the calves of her legs, and possibly from the so-called drag marks, although that there were actually any drag marks is not clearly shown, that she was dragged a part of the distance.

Of course, a fact may be shown by wholly circumstantial evidence, but there are too many gaps and uncertainties in the chain of argument upon which the respondent must rely. It begins with a pure assumption, and it proceeds with too many expressions such as, this might have happened, or that could have happened, and it is possible that she clung to some projection from the under surface of the overhang and was carried out there, or she may have been struck and stumbled a considerable distance before she actually fell. This is the language of surmise and speculation rather than that of inference. Inferences must be founded on facts. Here, we have a complete lack of factual evidence as to where, how, and when the accident occurred.

The plaintiff's complaint alleged ten separate grounds of negligence. The trial court submitted but three of these to the jury:

"(b) That said driver negligently failed to keep a proper lookout;

"(d) That the driver of said bus negligently failed to ring his gong or give other signal warning said Doris Ferguson of the imminence of an accident;

"(h) That said City and said bus driver were negligent in operating said bus at the time of the accident in the hours of darkness without head lights."

The appellant contends that there is no evidence in the record which warranted the jury in finding that any of these

three charges was true, and, therefore, the trial court should have dismissed the case on its challenge at the close of all the evidence and should have granted its motion for judgment notwithstanding the verdict.

█ It is our opinion that the issue raised by allegation (d) and the city's denial thereof should not have been sent to the jury. There is no evidence in the record that would enable a jury to find that the bus driver was at fault in failing to ring his gong, "or give other signal warning said Doris Ferguson of the imminence of an accident," and for that reason the city objected to the giving of any instruction as to that matter, but no exception was taken to the content of the instruction given. It reads, in part, as follows:

"If you find from the evidence that a reasonably prudent person, exercising due care and confronted with the same circumstances as the driver of the city bus, would have sounded his horn as a warning to plaintiff, and if you further find that such driver failed to do so *and if you further find there was time and opportunity so to do,* then such failure would be negligence, and if such negligence was the proximate cause of plaintiff's injuries, then plaintiffs are entitled to recover, unless you further find that the plaintiff wife was guilty of contributory negligence." (Italics ours.)

There is no evidence to the effect that the driver of the bus saw the plaintiff before the actual impact, and no really satisfactory evidence that he saw her even then. How, then, could it be found that "there was time and opportunity" for the driver to sound his horn as a warning to the plaintiff? Yet, as the court properly instructed the jury, it was necessary to find that he had such time and opportunity in order to find him negligent for failing to ring his gong or give other warning. It may, of course, be said that he should have seen the plaintiff had he kept a reasonably careful lookout, but that is a wholly separate and distinct issue covered by other instructions.

█ It is further our opinion that there is no evidence, or legitimate inference from evidence, that the bus driver

did not keep a reasonably careful lookout, under the circumstances, as claimed in allegation (b). No exception appears to have been taken to the instruction on this issue, the essence of which is contained in the second paragraph thereof and which reads as follows:

"If you find from a fair preponderance of the evidence that the driver of the city bus at the time in question failed and neglected to keep a reasonably careful lookout or failed to be reasonably alert and attentive to his driving in any one or more of the particulars charged in the complaint of the plaintiffs, and because of such failure, if any, the city bus struck and injured Mrs. Ferguson, then I instruct you that the city would be guilty of negligence, and the plaintiffs would be entitled to recover unless you further find that the plaintiff wife was guilty of contributory negligence."

We have already quoted the driver's testimony as to his driving. It was subjected to a long and complicated cross-examination which we cannot here quote. We have, however, carefully analyzed it, and, in our opinion, it does not impair his testimony in chief. According to his account, there was a long bus ahead of him, awaiting the green light signal. Of course, that signal released the heavy traffic coming north, which he was compelled to cross. He waited momentarily until there was a gap in that traffic, and, as he started and began to turn to the left, looked at the east crosswalk and saw no one traversing it. Then he turned his attention to the northbound traffic, and, when he got into the crosswalk, to the taxi stand in front of the Milwaukee depot from which a taxicab is liable to emerge at any moment.

"Before I started across the street I looked in the pedestrian crossing. I looked both ways. There was nobody in the pedestrian crossing. When I entered the pedestrian crossing I didn't see anybody, and after I left it, as far as that goes; but after about twenty-eight feet away, out of the pedestrian crossing in front of the bus I felt an impact of some kind. I thought I seen something brown. I thought it was a woman's hat."

This is the only account, if it can be called an account, of the accident. In our opinion, it does not show a failure

to keep "a reasonably careful lookout." The evidence is not even sufficient to permit a definite approach to the question under discussion. Obviously, the driver was charged with keeping a better lookout before he drove his bus into the crosswalk than he would be required to keep after the front of his bus had cleared it. But it cannot be determined from the evidence or by inference from evidence whether Mrs. Ferguson was struck when on the crosswalk or at some point to the east of it.

The third issue which the court sent to the jury was raised by the following allegation and the city's denial thereof:

"(h) That said City and said bus driver were negligent in operating said bus at the time of the accident in the hours of darkness without head lights."

That the bus had no headlights burning was at all times admitted. As this feature of the case, in our opinion, presents the most difficult problem submitted, we quote the instructions on that issue. While the city contends that these instructions should not have been given, it does not question the soundness of the instructions; nor do we.

"You are instructed that 'hours of darkness', as defined by law, means hours from one-half hour after sunset to one-half hour before sunrise.

"You are further instructed that on the day in question, war-time sunrise was at 8:37 a. m."

"The city ordinance and the state law require that at all times during hours of darkness at least two lighted head lamps shall be displayed—one on each side—at the front of every motor vehicle, exhibiting a white light visible at a distance of at least 500 feet to the front.

"It is admitted in this case that the bus of the City of Seattle was being driven on the public thoroughfares of the City of Seattle without such headlights.

"If you find by a preponderance of the evidence that such vehicle was being so driven during the hours of darkness at the time of the accident and that the failure to have such headlights materially contributed to cause and proximately caused the accident to the plaintiff, Mrs. Doris Ferguson, then I charge you as a matter of law that the driving of such vehicle, if it was so driven, would be actionable

negligence, and the plaintiffs would be entitled to recover unless you further find the plaintiff wife was herself guilty of contributory negligence."

It follows that the verdict cannot be sustained on the claim of negligence under discussion unless there was evidence, or legitimate inference from the evidence, (1) that the accident occurred prior to 8:07 o'clock; and (2) that the failure to have headlights "materially contributed to cause and proximately caused the accident to the plaintiff."

The allegation of the plaintiff's complaint is:

"VI. That on the 27th day of December, 1944, *at about 8:15* in the forenoon and during the hours of darkness, the defendant operated one of its busses without lights in a southerly direction on 4th avenue south which turned east across the pedestrian crosswalk on Jackson St. at the easterly side of 4th Avenue South." (Italics ours.)

There is no direct evidence in the record as to when the accident took place. If that can be determined at all, it must also be found by calculation and inference. In the cross-examination of Mr. Ferguson by the city, the following testimony was incidentally elicited:

"Q. What time of day was this? A. Just *about* eight o'clock in the morning. Q. Eight? Wasn't it closer to eight-thirty? A. No, it was eight o'clock, *about* eight o'clock when I let her out there. Q. What time did you leave home? A. Oh, *about* a quarter of eight. Q. How far away do you live from the scene of this accident? A. I think approximately six miles. Q. You think you made that in fifteen minutes? A. Oh, yes. Q. How was the traffic coming in from West Seattle at that time of day? A. There is lots of it, but Fourth Avenue and Spokane Street are both fast streets. They make good time on both of them." (Italics ours.)

We are here dealing with a very limited period of time. Mr. Ferguson did not pretend to fix the time by reference to a clock or watch, or in any other definite way. It is clearly evident from his testimony, above quoted, that he based his estimate of "just about eight o'clock" upon his recollection that he left home about a quarter of eight, and that it would probably take the fifteen minutes to drive

the "approximately six miles" to the Fourth avenue and Jackson street intersection. What time is "just about eight o'clock?" Suppose it could be established beyond all doubt that he actually let his wife out of the car at 8:09, 8:10, or 8:12. Could he justly or reasonably be accused of having given false or even misleading testimony?

As bearing upon the time of the collision, the bus driver testified as follows:

"Q. Do you know what time it was when you arrived at Fourth and Jackson? A. Well, it was approximately—I wouldn't state exactly, stake my life on it, but I'd say it would be about 8:25."

Appellant contends that the jury could wholly disregard this testimony because the driver was an interested witness. However that may be, it is obvious that his testimony as to time has but scant probative force, since he used words of estimate only, "approximately," "I wouldn't state exactly, . . . about 8:25."

It is suggested that there is another course of reasoning by which the jury could have found that the accident occurred prior to 8:07. Martin D. Collins, a witness called by the city, testified that he came downtown on a Jackson street westbound bus. He was seated on the left side of the bus. He saw the bus stopped in front of the Milwaukee depot as the bus in which he was riding reached Fifth avenue, and he could distinguish a woman lying in the street underneath the standing bus. The testimony upon which the calculation as to time is based is as follows:

"Q. Where was the woman? A. She was lying partially underneath the bus. We parked on the north side of the street and I could see her feet underneath the bus, and I remarked to the man that was sitting next to me, 'Thank the Lord, she isn't dead,' because I saw her move her feet. . . . Q. What was the light condition at that particular time? A. *Well, the time, as I recall, was about twenty minutes after eight.* It was so that I could see the woman lying underneath the bus from the Fifth Street intersection." (Italics ours.)

The first two steps in the argument are as follows: (1) Collins saw the woman lying in the street, "as I recall,

. . . about twenty minutes after eight"; and (2) since he saw her move her feet, the bus must have been rolled off her leg prior to that time. We quote from respondent's brief:

"*No one knows how great was the gap of time between the impact and the time when Mr. Collins arrived.* We do, however, know that at least these events transpired during the interval: Some time after the accident—no one knows how long—a military jeep arrived. A taxicab came up, drove around the left side of the stationary bus to the front of Union Station. The cab driver then got out of his cab, opened the trunk, sorted out the baggage to his respective passengers, received payment for his fares and had to make change. It wasn't until he got back into his cab that he noticed plaintiff wife lying under the wheel of this stationary bus. People were trying unsuccessfully to push the bus off the victim. The cab driver then put his cab against the front of the bus, was told by the bus driver not to move the bus, but went ahead anyway and pushed the bus back and then apparently left. Some time after all these events had transpired, Mr. Collins arrived at about twenty minutes after eight, as I recall.

"On these facts, it certainly cannot be said that the accident occurred after 8: 07 a. m., *as a matter of law.*" (Italics ours.)

As we understand this appeal, no one is contending that it can be found, "*as a matter of law,*" that the accident occurred after 8:07. The city contends that there was no substantial evidence from which a jury could find *as a fact* that the accident occurred prior to 8:07. That had to be established as a fact to warrant a verdict for the plaintiff on the allegation that the defendant was operating the bus at the time of the accident "during the hours of darkness."

It must be kept in mind that Mr. Ferguson did not testify that the accident happened at about eight o'clock. That was his estimate at the time he let his wife out of the car. After he had driven to the Second avenue extension, turned left, driven down Second avenue, and re-entered Fourth avenue, he looked back up Fourth avenue, saw, and recognized his wife. "I saw her starting across the intersection." At what point, on which street, or on which crosswalk, his

evidence does not show. We are in as good a position as the jury was to determine what Mr. Ferguson meant by just about eight o'clock, and we can do no more than speculate as to that. It is obviously a mere estimate, and, we think, may reasonably be interpreted to include 8:07, or even later. Nor do we know how much time elapsed after the plaintiff got out of the car before she was struck. At the time her husband got back into Fourth avenue by driving along two sides of the triangle, the plaintiff, according to his testimony, was "starting across the intersection." At what point or in which direction, we do not know. In our opinion, there is no substantial evidence that the accident occurred prior to 8:07.

■ But if the accident happened prior to 8:07, the plaintiff had the further burden of establishing (we quote from instruction No. 9) ". . . that the failure to have such headlights materially contributed to cause and proximately caused the accident to the plaintiff. . . ." We again repeat that there is no evidence from which it can be determined just where the accident occurred or how it happened. Moreover, there is not a single word of evidence as to plaintiff's actions or conduct after she alighted from her husband's automobile, other than that of her husband, that he saw her starting across the intersection. It would seem to be obviously impossible for a jury to find that the lack of headlights "contributed to cause and proximately caused the accident to the plaintiff," when it had no evidence whatever as to how it occurred. For the same reason, we reject, without discussion, the city's contention that the plaintiff was guilty of contributory negligence.

■■ The city contended throughout that Mrs. Ferguson was guilty of contributory negligence and, in this connection, took issue with respondent's contention that, since she suffered a complete loss of memory, the same presumption should be applied as would in law apply if she had been killed. This issue of law is argued pro and con in the briefs. We will not unnecessarily lengthen this already overlong opinion by discussing that question. For the purpose of this decision, but of this decision only, we will accept the posi-

tion of the respondent's counsel as correct. We will furthermore specifically rule that the presumption has not been rebutted. However, the city is likewise entitled to a presumption, to wit, that negligence cannot be presumed, but must be proved, and the evidence in the record is not sufficient to overcome that presumption. We are, therefore, compelled to hold that neither of the parties established the negligence of the other.

The verdict in this case was for $11,500. There is no claim that it is excessive. Mrs. Ferguson was hospitalized for long periods. She has undergone five operations, and at least another will be required. She was still wearing a cast on one leg when the trial was held, more than ten months after her injury. If in truth and in fact she was injured through the negligence of the appellant which, for all we know, may be the case, she was doubly unfortunate, in that her injuries were of such a character that she was unable to shed any light upon what actually occurred. But we cannot, for that reason, avoid or evade our obligation to enforce the paramount rule that negligence cannot be presumed, but must be proved.

The judgment appealed from is reversed, and the cause dismissed.

MILLARD, C. J., STEINERT, SIMPSON, and JEFFERS, JJ., concur.

CONNELLY, J. (dissenting)—I dissent for the reasons (1) that the testimony seems clear, when analyzed, that Mrs. Ferguson was crossing Jackson street from north to south within the marked pedestrian lane when she was struck by appellant's bus; (2) that there is satisfactory evidence from her physician that she suffered a loss of memory as one of the results of the accident and is, therefore, entitled to the presumption of having exercised due care for her safety; and (3) that the circumstantial evidence rule has been disregarded in the majority opinion.

The testimony of Wendell Ferguson, her husband, is as follows:

"Q. Mr. Ferguson, you remember the occasion when, the morning when Mrs. Ferguson was injured? A. I do. Q. Just tell the jury what you did. Tell what happened that morning, I'll put it that way. A. I took her to work at—as usual, or part way to work. It was the usual thing. That particular morning the reason I let her off over on the triangle between Fourth and Second was because of the viaduct on Fifth Avenue connecting Fifth and Fourth Avenue was closed, and I had been in the habit of letting her off at the bus stop and making a right turn around the depot and back to Fifth Avenue and on Fourth to Dearborn, but since that was closed, I couldn't make that turn. Traffic being heavy there, I went down the center of the Street, making it necessary to take her on around to where I could get to the curb, because I couldn't let her off there and let her walk through two lanes of heavy traffic to the bus stop. I had to take her over where she could get off at the curb and walk through pedestrian zones to get back to the bus stop. Q. *Just take the pointer, Mr. Ferguson, and show on the map the directions you went there and where you let her off.* A. I stayed right on the inside lane on Fourth Avenue South and made a left turn right *here* and then came back over and let her off right *here* as soon as I could stop, and then I came back out *here* and made a left turn and checked with the police later, and it was legal. Mr. Schramm: Just a minute. Q. Just tell what you did. You haven't any right to say anything else. A. All right. I made a left turn and came back to Second and came into Fourth Avenue there. Q. When you got there did you look any direction? A. Yes. I looked back here at the traffic coming south, heavy traffic at that time. It goes out to Boeings. Q. Did you see Mrs. Ferguson? A. *I did. I saw her starting across the intersection.* Q. Then what happened? A. Well, I just got a clear spot in the traffic and drove on down Fourth Avenue." (Italics mine.)

It should be borne in mind that, when Mr. Ferguson testified that he saw Mrs. Ferguson starting across the intersection, he was using a pointer and a map. Reference may be had to the plat, reproduced herewith, which was used in the trial and in the argument before this court.

The trial judge, in his memorandum decision which is a part of the statement of facts certified to this court in this appeal, used this language:

" 'The husband testified that as he proceeded, he looked back and saw his wife leaving the north curb at the northeast corner to proceed across Jackson Street on the east line of Fourth Avenue South; that it was about eight o'clock at the time she left his automobile.' "

The trial judge saw and heard the witness and saw him point as he detailed the various places on the map of the intersection of Fourth avenue south and Jackson street, with particular reference to where he had last seen his wife as she was waiting to cross Jackson street. I feel that we are bound by this interpretation of the witness's testimony as set forth in the memorandum opinion of the trial court.

Mrs. Ferguson had testified that, up to the point where her memory was blacked out, she had intended to cross Fourth avenue south from the northwest corner of the intersection where she had alighted from her husband's car, and thence to cross Jackson street to the southeast corner of the intersection for the purpose of taking a bus uptown to her work. Her testimony in this connection was as follows:

"Q. Which way were you going? A. North on Fourth Avenue to Jackson. Q. Then what did he do? A. Then he turned left and let me out. Q. He turned left and let you out, in the street or on the sidewalk? A. On the sidewalk. Q. On the sidewalk. Which direction from Fourth Avenue? A. The car was facing west. Q. And then you were on which side of Fourth Avenue? A. East or— Q. East or west? A. West. Q. What were you going to do then, Mrs. Ferguson? A. I was going to catch a bus. Q. Going in which direction? A. I was going to cross Fourth Avenue, going east, and then Jackson Street, going south. Q. And you were going to get the bus where? A. Right by the depot. Q. The bus going in what direction? A. Going north. Q. In other words, to go where? A. To work. Q. At— A. Trippy Fur Company in the Roosevelt Hotel. Q. Tell the jury what happened so far as you know? A. I got out of our car. Q. Do you remember anything after that? A. No, I do not. Q. What is the next recollection you have, Mrs. Ferguson? A. The next thing I remember I was at Providence Hospital."

It had been her custom to take the bus on the southeast corner of Fourth avenue south and Jackson street for many months prior to the date of her accident. Every logical in-

ference from the testimony leads to the conclusion that she crossed the street within the pedestrian lines and with the green traffic lights.

Supporting evidence of this is the condition of respondent's shoes and stockings, and the medical testimony concerning the condition of her legs immediately after the accident. The heels of her shoes were freshly ground down as though they had been placed upon an emery wheel. This could only have resulted from their having been dragged over a hard-surfaced street. The stockings were torn from her limbs and hung in shreds. Her physician testified that her legs looked as though they had been sandpapered. This could only have resulted from violent dragging against and friction with the hard surface of the street. No speculation is necessary to reach this conclusion. The simplest form of practical reasoning could reach no other conclusion. I know of no rule announced in any decision of this court which states that circumstantial evidence and the logical inferences deducible therefrom do not have their proper place in the trial of personal injury suits against owners of motor transportation vehicles.

It is inexplicable to me that the majority opinion neglects to mention the application of the rule of presumption of due care in cases which result in loss of memory to the plaintiff, rather than death, and where there is no testimony concerning the action and movement of the plaintiff prior to the accident. Considerable argument was presented in the briefs of both parties, and orally, on this question. The trial judge, in his memorandum opinion, resolved the case squarely upon this one question. His exact language was:

" 'If this is a proper case to apply the doctrine that the plaintiff wife was presumed to be exercising due care, then the verdict should stand; otherwise, it should not. The case has been a troublesome one for the court. A higher tribunal will undoubtedly be called upon to decide this question.

" 'The court is of the opinion that this is a proper case to apply the presumption. Therefore an order may be entered herein, denying the motion for judgment n.o.v. and a new trial.' "

The majority opinion does not decide this question. I feel that it should be decided. In *Tubb v. Seattle,* 136 Wash. 332, 239 Pac. 1009, we indulged the presumption of due care to a plaintiff who suffered a loss of memory, but not death, as a result of the injuries upon which her suit was based. In that case, the plaintiff had stopped to look into a shop window on Second avenue in Seattle. There was an open trap door near where she stopped, of which she was unaware. Presumably, she stepped into it. No witnesses saw her fall, but several witnesses testified to her condition and location immediately after her accident. She recovered a verdict and judgment was entered thereon. On appeal, this court said:

"It is next contended that the respondent was guilty of contributory negligence as a matter of law, but there is nothing in the record which would justify such a holding. *The presumption is that the party injured was in the exercise of ordinary care, and this presumption is not overthrown by the mere fact of injury.*" (Italics mine.)

Search among our own opinions fails to indicate any other case in which the presumption of due care for one's safety was indulged in favor of one who had suffered loss of memory as to the details of the accident in which he or she had been injured, but we have long been committed to the rule that the presumption of due care does obtain in death cases predicated upon alleged negligence, when no witness has observed the decedent immediately prior to the accident. The reason for this is that the deceased victim of an accident is unable to testify to his version of the facts, and no person is ever presumed to have deliberately committed suicide. The weight of authority recognizes the rule throughout the several states in the case of persons who have suffered loss of memory and are, therefore, unable to testify concerning the facts leading up to the injury.

"The rule is well established that where the loss of memory or other incapacity rendering the survivor of an accident incapable of testifying as to the accident, is shown to be attributable to such accident, it will be presumed, in the absence of evidence to the contrary, that he exercised due care." Annotation, 141 A. L. R. 873.

The same rule was recognized in *McNear v. Pacific Greyhound Lines,* 63 Cal. App. (2d) 11, 146 P. (2d) 34.

In *Torantolla v. Kansas City Rys. Co.,* 226 S. W. (K. C. Mo. App., 1920) 617, the court said:

"While there is no direct evidence that plaintiff knew of the existence of the rules, the facts show that plaintiff was very badly injured, especially about the head, his skull being fractured, which has resulted in his mind being affected, materially affecting his memory and power of concentration of mind. Plaintiff was put upon the stand, but was not able to recall the facts concerning the accident. Under such circumstances we think the same presumptions should be made in his behalf, as to knowledge of rules, reliance upon them, and the presumption of the exercise of ordinary care, as in the case of a person who is killed."

See, also, *Breker v. Rosema,* 301 Mich. 685, 4 N. W. (2d) 57, 141 A. L. R. 867; *Scott v. Sheedy,* 39 Cal. App. (2d) 96, 102 P. (2d) 575; *Stotler v. Chicago & A. R. Co.,* 200 Mo. 107, 98 S. W. 509; *Heaps v. Southern Pennsylvania Traction Co.,* 276 Pa. 551, 120 Atl. 548.

The majority opinion stresses the point that there were no eyewitnesses to the striking down of respondent, Mrs. Ferguson, in the pedestrian lanes by appellant's bus. It should be noticed that there were no eyewitnesses who claim that Mrs. Ferguson was walking anywhere except in the pedestrian lanes. The bus driver states that, after he had crossed the pedestrian lane, he saw a hat blow across the hood of his bus and that he at no time saw Mrs. Ferguson in the pedestrian lane. Under very similar circumstances, in a wrongful death case, we applied the rule of presumption of due care. In its opinion in *Richardson v. Pacific Power & Light Co.,* 11 Wn. (2d) 288, 118 P. (2d) 985, this court said:

"The question raised by appellants' exception relates to the legal effect of 'evidence of disinterested witnesses;' but there was no direct evidence, from either interested or disinterested witnesses, as to Richardson's actions at and immediately preceding the time of his death. The only evidence in the record which in any way runs counter to the presumption of due care as expounded in the first paragraph of the instruction, to which no excep-

tion was taken, is found in certain testimony concerning Richardson's actions some time before the accident and as to the physical circumstances existing before and after his death. None of that testimony can be classified as direct evidence; to the contrary, it was all of a highly circumstantial character. It is well established that the presumption of due care is not overcome by circumstantial evidence of this sort. *Reinhart v. Oregon-Washington R. & N. Co.,* 174 Wash. 320, 24 P. (2d) 615; *Smith v. Seattle,* 178 Wash. 477, 35 P. (2d) 27; *Morris v. Chicago, M., St. P. & Pac. R. Co., supra.* So, although appellants' exception correctly stated a general principle of law, it had no application to the evidence in this case, and the failure to charge the jury accordingly is therefore not reversible error."

Succinctly stated, therefore, we have the following facts in this case: It was the custom of Mrs. Ferguson to alight from her husband's car at the southeast corner of the intersection of Jackson street and Fourth avenue south for the purpose of taking a bus uptown to her work. On the morning of her accident, because of street repairs, it was necessary for Mr. Ferguson to drive his car in the traffic lane closest to the center of Fourth avenue south and turn left at the intersection, permitting his wife to alight on the northwest corner of the intersection. No conceivable reason is suggested anywhere in the record or in the briefs for Mrs. Ferguson doing anything other than that which she says she intended to do—cross Fourth avenue south from west to east and cross Jackson street from north to south for the purpose of taking a bus uptown to her work. Her husband testified, with a pointer and a map, that he looked back and saw her on the corner; that the traffic was heavy on Fourth avenue south going to Boeing's aircraft factory. The trial judge interprets his testimony as saying that he saw her on the northeast corner of the intersection.

Appellant's bus was on Fourth avenue south, headed south, but intending to turn to its left or east, crossing the pedestrian lane and proceeding on in an easterly direction on Jackson street.

"Whenever, at any point, traffic is controlled by traffic control signals exhibiting the words 'Go,' 'Caution,' or 'Stop'

or exhibiting different colored lights, the following words or colors only shall be used and shall indicate as follows:

"Green or the word 'Go,' under which circumstances vehicles facing such signal may proceed through the section of traffic control or turn right or left unless a sign at such point indicates such turns to be prohibited. Upon such signal exhibiting green or the word 'Go' vehicles shall yield the right of way to other vehicles *and to pedestrians lawfully in the intersection controlled area immediately prior to the time such signal is exhibited and shall permit them to proceed from the controlled area. . . ."* (Italics mine.) Rem. Rev. Stat., Vol. 7A, § 6360-98 [P.P.C. § 295-47].

Under this statute, it was the clear duty of the driver to look out for and give right of way to pedestrians crossing Jackson street in the lane which he would traverse in making a turn easterly on Jackson street. The court very clearly and properly instructed the jury in the language of the statute and a similar ordinance of the city of Seattle, and placed the duty of looking out for pedestrians between the white lines crossing Jackson street on the east side of the intersection with Fourth avenue south upon the driver of a vehicle proceeding in a southerly direction on Fourth avenue south and seeking to turn left, or east, in the intersection, on to Jackson street.

All of the facts in the record, in my opinion, presented questions for determination by the jury. It is significant that the jury resolved all of these questions in favor of respondent. I, personally, do not feel that I am in a position to question the understanding which the trial judge and the jury had opportunity to exercise in reaching their verdict and judgment.

The testimony of Mrs. Ferguson, detailing the course she intended to take across Fourth avenue south from west to east and across Jackson street from north to south to the bus stop, the testimony of her husband that he last saw her on the northeast corner of the intersection of Fourth avenue south and Jackson street as interpreted by the trial court in its memorandum decision, the rule as to presumption of the exercise of due care for her safety by Mrs. Ferguson in view of her loss of memory from the injuries sus-

tained by her, and the circumstantial evidence rule; all, in my opinion, require affirmance of the judgment of the trial court.

MALLERY, SCHWELLENBACH, and ABEL, JJ., concur with CONNELLY, J.

---

April 8, 1947. Petition for rehearing denied.

